891 P.2d 1054

STATE of Idaho, Plaintiff–Respondent,

v.

James CAGLE, Defendant–Appellant.

No. 20832.

Court of Appeals of Idaho.

Jan. 13, 1995.

Rehearing Denied March 23, 1995.

Van G. Bishop, Canyon County Public Defender, Nampa, argued for appellant.

Alan G. Lance, Atty. Gen.; Michael A. Henderson, Deputy Atty. Gen., Boise, for respondent Michael A. Henderson argued.

WALTERS, Chief Judge.

This is an appeal from a judgment of conviction, pursuant to a jury verdict, of one count of burglary and one count of aggravated battery. Appellant James Cagle argues that the district court erred in denying his motion for a continuance to obtain new counsel. He also challenges the district court's instruction on reasonable doubt and the sentences imposed. For the reasons expressed below, we affirm the judgment of conviction and sentences.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Jeanette Wickersham testified that in the early morning hours of Wednesday, February 10, 1993, she was sleeping in her bed with two of her daughters, fourteen-year-old T.P. and four-year-old L.S.W. Her other three children were asleep elsewhere in the house. At 4:00 a.m., Wickersham was awakened by the repeated ringing of her doorbell. According to Wickersham, she and T.P. got out of bed and went to the kitchen. Wickersham yelled through the door, "Who is out there?" but got no response. She then turned on the porch light and looked out the kitchen window.

Standing outside the door was James Cagle, whom she knew only as "J.P." Wickersham had worked with Cagle occasionally at a local convenience store a few years before.

She asked him what he was doing at her home and he responded, "I'm suicidal. Open the door." She refused to do so and told him he should go to his family for help. After about a ten-minute conversation through the window, Wickersham turned off the porch light and shut the blinds. Cagle drove away, and Wickersham and T.P. went back to bed.

Wickersham further testified that at approximately 5:30 a.m. the same morning, as she lay in bed, she heard a series of more than six impacts shattering a glass patio door that opened into her bedroom. Cagle came through the broken door holding a double-headed mallet in his right hand and a knife in his left. Wickersham later discovered that the mallet had come from her shed and the knife had been taken from her camper. T.P. began screaming, and Cagle told her to shut up and hit her on the head with the mallet. Wickersham attempted to talk with Cagle, but he told her, "I'm not here for that. I'm here for all your children and you." He told her to round up all of her children and made her bring them into the living room. Wickersham continued to try to reason with Cagle and asked him to let her children get ready for school. Cagle responded, "No. They're not going to school today. They're never going to go to school again." He also stated, "Which one [of your children] do you want me to do away with now and you pick their order and then I'm going to do you in last." He requested a rope and then a telephone cord. Wickersham said she did not have either item, and that she did not even have a telephone. Cagle became angry and called her a liar. He then began directing her and the children into the garage. While still in the house, Wickersham gestured to her children that they should make a run for the front door. T.P. ran to the front door, and Wickersham picked up L.S.W. and ran out of the door after T.P.

As Wickersham ran toward the street she heard footsteps behind her and felt "a lunge into [her] back like a scrape." She fell forward onto the street with L.S.W. in her arms. As she rolled over, she saw Cagle standing over them. According to Wickersham, Cagle swung the mallet and hit L.S.W. in the head. He then began jabbing them

with the knife, cutting L.S.W. twice in the chest and Wickersham across the top of her feet and in the knee. A neighbor, alerted by T.P.'s calls for help, ran out of his house toward the street. Cagle dropped the knife and ran.

The police arrived on the scene at approximately 6:00 a.m. They found the knife in the street and the handle of the mallet in the front yard. The Wickersham's dog found the head of the mallet on the grounds on a later date. The officers also found pliers near the grounds and pry marks on the knob of the rear door of the Wickersham house. The pry marks matched the pliers.

At approximately 6:13 a.m., Cagle was found sitting in a car near the Wickersham house. He was brought back to the scene of the attack, where he was identified by Wickersham. A breath test administered to Cagle following his arrest revealed a blood alcohol concentration of .26 percent.

Cagle testified in his own behalf and provided a different version of events. He claimed that he and Wickersham had gone out on several occasions and had been sexually involved. He stated that on the night of the crime, he first appeared at Wickersham's home at approximately 3:00 a.m. He claimed that Wickersham allowed him to enter the house and that they spoke for an hour or hour and a half. He said that while on his way home, he tried to pull into his uncle's driveway, but instead, got his car stuck on someone's lawn. He later went back to Wickersham's house to try to persuade her to help him tow his car with her truck. Once at Wickersham's home, Cagle picked up a mallet which he claimed was beside the glass door. When asked why he picked up the mallet, Cagle could provide no explanation, stating only, "I don't know. It was just—I did." Cagle further testified that he then kicked open the glass door and went inside, where "everybody was just yelling and screaming." He admitted hitting T.P. on the head with the mallet, but denied having a knife or threatening or stabbing anyone that morning. He stated that after Wickersham and her children ran from the house, he returned to his car and waited for the police.

Cagle was charged by Information with burglary and three counts of aggravated battery by use of a deadly weapon or instrument. One count of aggravated battery charged him with hitting T.P. in the head with a mallet; the other two counts charged him with the knife attacks on Wickersham and L.S.W.

Cagle was arraigned in district court on March 12, 1993, and was represented by retained counsel, John Christensen. Cagle entered pleas of not guilty, and a jury trial was set for June 16, 1993. On the first day of trial, Cagle expressed dissatisfaction with Christensen's preparation for trial. The district court treated Cagle's remarks as a motion for a continuance to obtain new counsel and denied the motion.

The jury found Cagle guilty of burglary and of one count of aggravated battery for Cagle's attack with the mallet on T.P. The jury was unable to reach verdicts on the other two counts of aggravated battery. Cagle was sentenced to eight years' incarceration for burglary, with a five-year minimum period of confinement, and to twelve years' incarceration for aggravated battery, with a five-year minimum period of confinement. The court ordered that the sentences be served concurrently. A motion for reduction of sentence pursuant to I.C.R. 35 was subsequently denied.

## II. ANALYSIS

A. *Whether the district court abused its discretion in denying Cagle's motion for a continuance.*

■ On the day of the trial, Christensen moved to withdraw as Cagle's attorney, stating that Cagle had expressed dissatisfaction with his performance. The following colloquy then occurred:

THE COURT: Okay. Mr. Cagle, why do you want to have your attorney withdraw?

MR. CAGLE: Well, I don't think the amount of time necessary for this case has been spent on it. We haven't been able to get ahold of any witnesses until last night I understand. I just—I don't know. I've talked to another attorney. He's agreed to

take the case if I can get this motion okayed or dropped or whatever. I don't know how else to put it. I don't think there's been enough work done on it to make proper representation.

THE COURT: Well, what's the State's position?

[PROSECUTOR]: Judge, just dealing with that particular motion, we would object. We feel that—I know that I've had many conversations with Mr. Christensen about this case. I can assure the Court that in my dealings with him, he has always been prepared, very aware of the case. He has reviewed the evidence. The time is today for the jury trial. The State's ready.

I don't know if I can impress upon the Court what this is doing to my victim and her family, but they're having additional problems. Right now they're involved in a CPA [Child Protection Act] action in fact. I talked to the handling attorney on that and he feels that it's related to the stress from this case. So I think in fairness to the victims as well as the State that we best move forward. I wouldn't say that, Judge, if I felt that Mr. Christensen wasn't able to do a competent job. I believe that he can. I think he is prepared.

THE COURT: This matter started I think by a Complaint being filed February 10 and here we are June 15. The claim that your attorney is ill-prepared or some such claim is often heard on the day of trial as here. I'm satisfied that the claim is not well-founded. I'm going to deny the motion to continue or to discharge Mr. Christensen at this point. I don't think you're asking to discharge him. I think what you're asking is to get a continuance so you can obtain another attorney. I'm going to deny that motion.

Cagle argues that the district court erred in denying his motion to continue the trial so that he could obtain new counsel.

■ The decision to grant or deny a continuance is vested in the sound discretion of the trial court. *State v. Ward*, 98 Idaho 571, 574, 569 P.2d 916, 919 (1977). Generally, it has been held that unless an appellant shows that his substantial rights have been preju-

diced by reason of a denial of his motion for continuance, appellate courts can only conclude that there was no abuse of discretion. *State v. Laws*, 94 Idaho 200, 202, 485 P.2d 144, 146 (1971). " 'Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons.' " *State v. Carman*, 114 Idaho 791, 793, 760 P.2d 1207, 1209 (Ct.App.1988), *quoting Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983).

■ Where a defendant seeks new counsel, several factors are relevant: the timing of the motion; the requested length of delay, including whether the delay is an attempt to manipulate the proceedings; the number, if any, of similar continuances sought by the defendant; inconvenience to witnesses; any prejudice to the prosecution; whether an irreconcilable conflict exists between the accused and counsel; and the qualifications possessed by present counsel. *Carman*, 114 Idaho at 793, 760 P.2d at 1209. We examine these factors in turn.

The first of these factors, the timing of the motion, supports the district court's denial of Cagle's motion. Cagle's motion for a continuance was made on the day of trial, June 16, 1993. In this motion, Cagle's attorney, Christensen, recited that he had talked to the court the previous day, in chambers, concerning the defendant's dissatisfaction with him. Christensen had been retained as Cagle's attorney since at least March 12, 1993, when he represented Cagle at his arraignment. Christensen subsequently represented Cagle at three separate hearings regarding the bail amount, held in March and April 1993, at which he succeeded in having Cagle's bail reduced from $200,000 to $25,000. During this three-month period, Cagle expressed no dissatisfaction with Christensen.

Second, Cagle did not request any specific length of delay. Although he believed that he could readily obtain another attorney, new counsel would have required time to become fully familiar with the case. Further, the

state argues, the court's calendar was crowded: during one of the bail reduction hearings, the judge expressed his desire to move up the date of the trial because the defendant was incarcerated, but stated that he was unable to do so.

While the record does not suggest that Cagle sought prior continuances, this fact is certainly outweighed by the fourth factor, inconvenience to the witnesses. Eight witnesses were assembled and prepared to testify the day of trial. Wickersham and her family were suffering as a result of the stress of the proceedings and were entitled to timely resolution of the case. Analyzing the fifth factor, we note that the record does not indicate an "irreconcilable conflict" between Cagle and his attorney and there was no representation that communication between them had broken down. Indeed, counsel was able to present a vigorous defense at trial, including calling Cagle as a witness. Finally, a review of the record indicates that Christensen performed well at trial, particularly considering the strength of the evidence implicating Cagle in the crimes for which he was charged.

Cagle's only complaint with Christensen was that he did not contact or present certain witnesses. He does not provide us with any information as to who these witnesses would have been or what they would have divulged.

Relying on *United States v. Walker*, 915 F.2d 480 (9th Cir.1990), Cagle argues that the district court failed to make sufficient inquiry into the causes of Cagle's dissatisfaction with his attorney. In *Walker*, the Ninth Circuit Court of Appeals held that a federal district court erred in denying the defendant's motion to substitute counsel. The facts of *Walker*, however, are easily distinguished from the facts present here. In *Walker*, the defendant had written the district court a week prior to trial, providing a list of witnesses he believed to be crucial to his defense and which his public defender

refused to contact. *Id.* at 481–82. The district court did not read the letter until after the first day of trial. *Id.* at 482. No such circumstances were present here. Additionally, on the day of trial the public defender in *Walker* represented that there existed irreconcilable conflicts between herself and the defendant which prevented her from representing him. *Id.* However, the district court made no inquiry into the conflicts and denied the motion based solely on its conclusion that the public defender was competent. *Id.*

In the instant case, however, neither Cagle nor his attorney disclosed the specifics of any alleged irreconcilable conflicts. Although the district court allowed Cagle ample opportunity to express the grounds for his dissatisfaction with Christensen, the court did not find his reasons compelling. We cannot say that Cagle's substantial rights were prejudiced by the district court's decision or that the court abused its discretion by denying Cagle's motion for a continuance.

B. *Reasonable Doubt Instruction.*

█ Cagle contends that the district court's instruction on reasonable doubt was unconstitutional and constituted reversible error. He claims that the district court, in employing the phrases "moral evidence" and "moral certainty," instructed the jury in a manner prohibited by the United States Supreme Court in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990).

The district court defined reasonable doubt using the California Jury Instruction ("CALJIC") approved by the Idaho Supreme Court in *State v. Cotton*, 100 Idaho 573, 577, 602 P.2d 71, 75 (1979), and *State v. Holm*, 93 Idaho 904, 908, 478 P.2d 284, 288 (1970).[1] Our Supreme Court has upheld the constitutionality of this instruction in light of the *Cage* opinion. *State v. Rhoades*, 121 Idaho 63, 82–83, 822 P.2d 960, 979–80 (1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 962, 122

1. The CALJIC reasonable doubt instruction reads as follows:

Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.

L.Ed.2d 119 (1993). Recently, the United States Supreme Court addressed the constitutionality of this same CALJIC instruction, focusing in particular on the phrases "moral evidence" and "moral certainty" in *Victor v. Nebraska* and *Sandoval v. California*, both reported at 511 U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). There, the Court distinguished the CALJIC instruction from the illegal instruction given in *Cage*, and held that although the Court did not condone use of the phrase "moral certainty," the CALJIC instruction, taken as a whole, did not violate due process. 511 U.S. at ——, 114 S.Ct. at 1247, 127 L.Ed.2d at 597. Based on the foregoing, we conclude that the jury in this case was properly instructed with respect to the definition of reasonable doubt.

C. *Whether the district court abused its discretion by not imposing an alternative form of sentencing which would provide alcohol treatment.*

▮ The district court imposed a sentence of eight years' incarceration, with a five-year minimum period of confinement, for the burglary and a twelve-year sentence, with a five-year minimum period of confinement, for the aggravated battery, to be served concurrently. Cagle argues that the sentences are excessive and that the district court should have imposed an alternative sentence which would have provided him with alcohol treatment.

▮ The sentences imposed were within the statutory maximums of ten years for burglary and fifteen years for aggravated battery. I.C. §§ 18–1403, –908. Where a sentence is within the statutory maximum, we will uphold it unless the sentencing court abused its discretion. *State v. Kysar*, 116 Idaho 992, 999, 783 P.2d 859, 866 (1989). A sentence may represent such an abuse if it is shown to be unreasonable upon the facts of the case. *Id.* Cagle's sentences were imposed pursuant to the Unified Sentencing Act, I.C. § 19–2513, which allows the court to specify a minimum period of confinement. Where a sentence has been imposed under the Unified Sentencing Act, the minimum fixed portion of the sentence is viewed as the term of confinement for the purpose of appel-

late review. *Id.* Thus, Cagle must establish that the concurrent five-year fixed sentences for his burglary and aggravated battery convictions are unreasonable and constitute an abuse of discretion.

▮ Where a sentence is alleged to be excessive, the appellate court will make an independent examination of the record, having regard to the nature of the offense and the character of the offender. *State v. Shideler*, 103 Idaho 593, 594, 651 P.2d 527, 528 (1982); *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). A sentence of confinement is reasonable if it appears at the time of sentencing that confinement is necessary to accomplish the primary objective of protecting society and to achieve any or all of the relating goals of deterrence, rehabilitation, or retribution applicable to a given case. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982); *State v. Walker*, 125 Idaho 11, 12, 867 P.2d 244, 245 (Ct.App.1993).

Cagle contends that there is "nothing in the record" to illustrate why the five-year fixed sentences were necessary to accomplish either the primary objective of protecting society or to achieve any of the related goals. Though Cagle fails to precisely articulate what sentence the court should have imposed in order to address his alleged alcoholism, his argument appears to be that the court should have placed him on probation with the condition that he participate in an alcohol treatment program. We disagree.

Cagle's assertion rests on the premise that he is only violent when drinking. This premise is belied by the record. Cagle stated in the Presentence Investigation Report (PSI) that he began drinking at age nineteen. However, his violent behavior existed well before that time. The PSI indicates that as a juvenile in the state of Washington, Cagle had committed acts of arson, theft, assault, brandishing a weapon, burglary and malicious mischief. At the age of thirteen, Cagle entered a girl's apartment, and when she asked him to leave, he pulled out a knife. He then grabbed her buttocks, put the knife to her throat and told her not to push him or he would use the knife. When he thought the girl's father had come home, Cagle fled. A

few days later, Cagle followed a twelve-year-old girl as she walked home, threatened her with a knife and told her to go into an alley. The girl managed to flee.

At the age of fourteen, a more serious attack occurred, with facts resembling those in the instant case. Two females, ages fifteen and eighteen, were asleep in an apartment. The fifteen year-old was awakened by a knock at the door and went to answer it. Cagle, carrying a rifle, forced his way in. He pointed the rifle at the fifteen-year-old's head and walked her into the kitchen, where he searched the drawers and asked if there were any knives or rope. He eventually took the girl into the bedroom to wake the eighteen-year-old. Cagle ordered the older female to take off her shirt, and when she refused, he ordered the younger girl into the closet. Cagle stayed in the apartment for two to three hours, threatening to shoot the eighteen-year-old and touching her breasts and vaginal area. He fled when he realized that the fifteen-year-old had escaped from the closet and jumped to the ground from a second floor window.

Cagle, who was twenty-one years old at the time of sentencing, spent the remainder of his juvenile years incarcerated in institutions, during which time he was cited on several assault charges. As an adult, Cagle compiled an extensive record of misdemeanors, including minor consumption, reckless driving, theft, resisting or obstructing officers, driving without privileges and driving without insurance.

In sentencing Cagle, the district judge found that the incident involving the eighteen and fifteen-year-old females was "very relevant," despite the fact that it took place when Cagle was fourteen years old, because it strongly parallelled the facts of this case and because Cagle had been incarcerated for much of the time since then. The judge took into account Cagle's character and the goal of protecting society, stating that Cagle was "not somebody that needs to be thrown away at this point," but that "at the same time, society is going to have to protect itself in some way."

The district judge also considered Cagle's excessive drinking, concluding that Cagle's failure to address the problem created a risk to society which made incarceration necessary. The judge stated, "Now, I don't see this as an alcohol [problem]. Maybe you wouldn't have done it sober but with your history of anger, the fact that you get drunk the fact that you have not by yourself taken care of that problem creates I think a risk." Indeed, Cagle has been aware of his alcohol problem for some time and has apparently been unaffected by prior alcohol treatment programs. The PSI indicates that Cagle attended an alcohol abuse counseling program in the state of Washington a few years before the crimes in this case occurred. In light of the fact that alcohol treatment has thus far been unavailing and that Cagle's criminal behavior existed prior to his indulgence in alcohol, we are unpersuaded that the minimum periods of confinement imposed by the sentences were improper.

We are convinced that the district court properly considered the objectives of sentencing, the nature of the offense, and the defendant's character and background, including his alcohol problem. The sentences imposed did not constitute an abuse of discretion and are therefore affirmed.

## III. CONCLUSION

We hold that the district court did not err in denying Cagle's motion for a continuance to obtain new counsel. We also conclude that the district court's instruction on reasonable doubt was proper. Finally, we uphold the sentences imposed as a proper exercise of the district court's sentencing discretion. Accordingly, Cagle's judgment of conviction and sentences are affirmed.

LANSING and PERRY, JJ., concur.