909 P.2d 624

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Steven Paul PRIEST, Defendant–Appellant.**

**No. 20333.**

Court of Appeals of Idaho.

Nov. 30, 1995.

Petition for Review Denied Jan. 31, 1996.

Wiebe & Fouser, Caldwell, for appellant. Scott E. Fouser, argued.

Alan G. Lance, Attorney General; Michael A. Henderson, Deputy Attorney General, Boise, for respondent. Michael A. Henderson, argued.

LANSING, Judge.

Steven Paul Priest was convicted of first degree murder and was sentenced to life

imprisonment without the possibility of parole. On appeal, Priest contends the district court erred in denying Priest's pretrial motion for substitute counsel and his motion for a new trial, in instructing the jury, and in sentencing. Priest also argues that there was misconduct by the prosecutor in the State's opening statement and closing argument. We affirm.

## A. The district court did not err in denying Priest's pro se pretrial motion for substitute counsel.

Two attorneys were appointed by the court to represent Priest,[1] who was charged with first degree murder in the shooting death of Stan Trineer. On July 15, 1991, approximately one week before the scheduled trial date, Priest filed a pro se motion for appointment of new counsel. Priest alleged that conflicts with his attorneys and a complete breakdown of communication with them necessitated appointment of substitute counsel. The district court conducted a hearing at which Priest was allowed to explain his dissatisfaction with his attorneys. Priest said that his attorneys had refused to confer with him in the preparation of the defense, refused to file certain motions that he requested, and had not adequately investigated the case or subpoenaed witnesses in his favor. Priest told the court that he had filed a malpractice suit against the attorneys, which he believed created a conflict of interest. Priest also complained that when he refused to discuss with the attorneys the possibility of a plea bargain, one of the attorneys used an invective and said that it would not be the attorney's fault if Priest got the death penalty as a consequence of his refusal to plea bargain.

When questioned by the district court, Priest's attorneys corroborated that there had been no communication between them and their client for about three weeks, but explained that it was due to his refusal to speak with them, not to any unwillingness on their part. The attorneys stated that they had diligently investigated the case and pursued the leads given them by Priest. They acknowledged, however, that because of Priest's refusal to speak with them, they could not be prepared for trial the following week.

The district court found that Priest had not demonstrated a need for new counsel. Expressing disapproval of Priest's attempt to create a conflict of interest by suing his attorneys, the court noted that the lawsuit was premature, and therefore frivolous, because there had not yet been any outcome of the criminal proceedings on which a claim of damage or injury could be predicated. The court noted:

> [T]o adopt the idea that a person, by simply filing a lawsuit against the attorney appointed to represent him, regardless of whether that lawsuit could even survive a motion to dismiss, can result in disqualification of counsel would lead to the situation in which some cases could never be tried. Because it could simply be a matter that a defendant could file against successive attorneys such a motion ... in any instance in which they disagreed with his concept of how the case should be handled and that attorney would be disqualified. That is not a rule of law that we're going to develop.

The district court found that the conflict between Priest and his attorneys was largely of Priest's own making and consisted primarily of disagreements about trial strategy. The court explained to Priest that trial strategy is primarily the responsibility of counsel after consultation with the client. The court also observed that defense counsel had filed a number of pretrial motions that were well-researched and briefed. It was the court's conclusion, therefore, that good cause for substitution of counsel had not been presented where counsel was not shown to be ineffective in pretrial representation.

Although the district court denied Priest's motion for new counsel, it granted a seven-week continuance of the trial to afford Priest and his attorneys the opportunity to reestablish communication and prepare for trial. The trial proceeded as rescheduled on September 4, 1991.

1. These are not the same attorneys who represent Priest on this appeal.

It is well settled that an indigent's right to court-appointed counsel includes the right to effective assistance of counsel, but it does not necessarily include the right to an attorney of one's own choice. *State v. Clayton,* 100 Idaho 896, 897, 606 P.2d 1000, 1001 (1980); *State v. Browning,* 121 Idaho 239, 244, 824 P.2d 170, 175 (Ct.App.1992). Upon a showing of good cause a trial court may appoint substitute counsel for an indigent, such decision lying within the discretion of the trial court. *Id.; State v. Clark,* 115 Idaho 1056, 1058, 772 P.2d 263, 265 (Ct.App. 1989). An abuse of discretion will be found if the denial of such a motion results in the abridgement of an accused's right to counsel. *State v. Carman,* 114 Idaho 791, 793, 760 P.2d 1207, 1209 (Ct.App.1988), *aff'd,* 116 Idaho 190, 774 P.2d 900 (1989).

In the case before us we find no fault in the district court's decision to deny substitution of counsel but to grant a continuance of the trial. We agree with the district court's observation that a criminal defendant may not compel the court to appoint a new attorney by refusing to cooperate with his existing attorney or otherwise manufacturing his own conflict.

As support for his position, Priest relies heavily on *Frazer v. United States,* 18 F.3d 778 (9th Cir.1994). In that case, the defendant sought relief for ineffective assistance of counsel, claiming in his motion: "That his appointed trial attorney had called him a 'stupid nigger son of a bitch and said he hopes I get life. And if I continue to insist on going to trial I will find him to be very ineffective.'" *Id.* at 780. The Ninth Circuit Court of Appeals held that in light of these allegations the trial court erred in failing to hold an evidentiary hearing on the defendant's motion. The court stated that the facts alleged by the defendant, if proved, "would render so defective the relationship inherent in the right to trial counsel guaranteed by the Sixth Amendment that Mr. Frazer would be entitled to a new trial with a different attorney." *Id.* at 784.

Priest claims that his allegation that his attorney used abusive language when Priest refused to discuss the possibility of a guilty plea is indistinguishable from the situation presented in *Frazer.* We do not agree. The defense attorney's alleged conduct in *Frazer* included an abhorrent racial slur, suggesting that racial prejudice may have impaired counsel's dedication to vigorous representation of the client; a statement of counsel's hope that defendant would get a life sentence, indicating a complete failure of the duty of loyalty which has been described as "perhaps the most basic of counsel's duties," *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); and an overt threat to deny Frazer any assistance if he refused to plead guilty. None of those factors are present in Priest's case. There is no allegation that Priest's attorney harbored any bias or prejudice against him, that he harbored or expressed any hope that there would be an adverse outcome of the trial for Priest, or that he threatened not to vigorously defend Priest to the best of the attorney's ability. What Priest has shown is that his attorney used invectives in expressing his frustration when Priest declined even to discuss the option of a plea agreement to eliminate the risk of a death penalty, which would be an option for the sentencing court if Priest were found guilty of the charged offense at trial. Where a client faces the risk of capital punishment, defense counsel will nearly always find it prudent to consider and discuss with the client the possibility of a plea bargain to remove that threat. Although abusive language is not to be condoned, in this context Priest has not shown any breach of his attorney's duty of loyalty or any unwillingness on the part of his attorney to zealously defend Priest following Priest's refusal to consider a plea bargain.

Accordingly, the district court's denial of Priest's motion for substitute counsel is affirmed.

**B. The jury instruction defining reasonable doubt was not improper.**

The district court gave to the jury the following instruction regarding reasonable doubt:

A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt

whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is not a mere possible doubt, because anything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. Reasonable doubt is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.

This instruction is nearly identical to, and substantively indistinguishable from, the instruction that was approved for use in this state by the Idaho Supreme Court in *State v. Holm*, 93 Idaho 904, 908, 478 P.2d 284, 288 (1970), and again (with a slight modification substituting the words "a verdict of not guilty" for "an acquittal") in *State v. Cotton*, 100 Idaho 573, 576–77, 602 P.2d 71, 74–75 (1979). Nonetheless, Priest argues that use of this instruction violated his constitutional right to require that the State prove every element of the charge beyond a reasonable doubt because the term "moral evidence" is confusing and archaic and could have been understood by the jury to refer to the ethics or morality of the crime that Priest was accused of committing. For this argument Priest relies upon the recent United States Supreme Court decision in *Victor v. Nebraska*, 511 U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), where the Court considered a reasonable doubt instruction that is in all relevant aspects identical to the one at issue here. Priest asserts that the phrase "moral evidence" was disapproved by the Supreme Court in *Victor*, but in our view that is not an accurate characterization of the *Victor* opinion. The Supreme Court there concluded that "moral evidence," within the context of the jury instruction, could only mean the proof introduced at trial. *Id.*, 511 U.S. at ——, 114 S.Ct. at 1246, 127 L.Ed.2d at 595. Moreover, in a decision issued subsequent to *Victor*, the Idaho Supreme Court once again considered a challenge to this instruction and found no error in its use.

*State v. Sivak*, 127 Idaho 387, 390, 901 P.2d 494, 497 (1995). *See also State v. Cagle*, 126 Idaho 794, 798–99, 891 P.2d 1054, 1058–59 (Ct.App.1995).

As in *Victor* and *Sivak*, in Priest's case the jurors received additional instructions regarding their duty to weigh only the evidence presented in court. The district court instructed the jurors that they should perform their duty uninfluenced by pity for the defendant or by any passion or prejudice against him, that they must not be biased against the defendant because he had been charged or because he had been brought before the court to stand trial, and that in deciding the question of guilt, they were to be governed solely by the evidence introduced in the trial and the law as stated to them by the court. We therefore hold that use of the term "moral evidence" was not misleading or improper.

Priest also finds fault with that portion of the instruction which defines reasonable doubt as that state which "leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." Priest asserts that the use of the plurals "jurors" and "they" in this sentence creates the erroneous impression that a doubt is reasonable only if all the jurors hold the same doubt.

■ We do not share Priest's concern that the sentence was so interpreted, particularly in view of the instructions as a whole. When a constitutional challenge to a jury instruction is presented, the court's inquiry, "is not whether the instruction 'could have' been applied in unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it." *Victor*, 511 U.S. at ——, 114 S.Ct. at 1243, 127 L.Ed.2d at 591. Considering the entirety of the jury instructions given in Priest's case, it is not likely that the jury would have understood that a doubt may be reasonable only if all of the jurors share it. Separate instructions informed the jurors that both parties were "entitled to the individual opinion of each juror," that each juror "must decide the case for yourself," and that jurors should not be influenced to decide any question in a partic-

ular way merely because a majority of the jurors favor such a decision. Therefore, we find no violation of constitutional standards in the use of the jury instruction regarding reasonable doubt.

### C. The prosecutor's comments in opening statement did not constitute fundamental error.

 The function of an opening statement was described in *State v. Griffith*, 97 Idaho 52, 56, 539 P.2d 604, 608 (1975):

Opening statements serve to inform the jury of the issues of the case and briefly outline the evidence each litigant intends to introduce to support his allegations or defenses, as the case may be. While counsel should be allowed latitude in making an opening statement, the trial court may limit the scope of that statement in the exercise of its discretion. Generally, opening remarks should be confined to a brief summary of evidence counsel expects to introduce on behalf of his client's case-in-chief. Counsel should not at that time attempt to impeach or otherwise argue the merits of evidence that the opposing side has or will present.

In the opening statement in Priest's case, the prosecutor outlined the anticipated testimony of each of the State's witnesses. The prosecutor said that witnesses had heard Priest claim that he killed Trineer, but they did not immediately report it to the police because they were afraid of Priest. As a basis for this fear, the prosecutor indicated the witnesses had heard Priest claim that he was a hit man from New Orleans, that he knew who to call in order to "have someone disappeared," that he had ties to police in Boise who would let him know if someone was being a "snitch," that he knew how to tap telephones to check up on people, and that he knew how to shoot people to make them suffer so they would give information. Although Priest made no objection during the State's opening statement, he now contends that these remarks amounted to prosecutorial misconduct warranting a reversal of his conviction. Priest complains that these comments served to inflame the jury with irrelevant prejudicial statements about

Priest's prior criminal acts, argued credibility, and focused the jury's attention on the allegedly sordid character of Priest and his associates rather than on the evidence tying Priest to Trineer's death.

 The nature of our review is restricted by Priest's failure to object to these prosecutorial comments during the opening statement. A timely objection enables the trial judge to rule on the alleged error, provide a curative admonition to the jury if appropriate, and prevent the continuation of the alleged misconduct. In the absence of a timely objection to an alleged error at trial, the error generally will not be considered on appeal. *State v. LaMere*, 103 Idaho 839, 844, 655 P.2d 46, 51, (1982); *State v. Sharp*, 101 Idaho 498, 503, 616 P.2d 1034, 1039 (1980). In a criminal case, however, "we temper the failure to timely preserve an issue by the doctrine of fundamental error." *State v. Missamore*, 114 Idaho 879, 882, 761 P.2d 1231, 1234 (Ct.App.1988). Although we have found no previous cases considering an allegation of fundamental error in an opening statement, it is well established that prosecutorial misconduct during closing argument will be deemed fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a timely objection and a ruling from the trial court informing the jury that the comments should be disregarded. *State v. Smith*, 117 Idaho 891, 898, 792 P.2d 916, 923 (1990); *State v. Peite*, 122 Idaho 809, 821–22, 839 P.2d 1223, 1235–36 (Ct.App. 1992); *Missamore*, 114 Idaho at 882, 761 P.2d at 1234. We conclude that this same standard should be applied to claims of prosecutorial misconduct in an opening statement where no objection was raised below.

 Priest argues that he was irreparably prejudiced by the prosecutor's reference to Priest's alleged boasts about his criminal background, ability to kill or arrange to have persons killed, and his access to information through wire taps and police contacts. We conclude, however, that this argument cannot be sustained because testimony about all of these alleged boasts was admitted during the State's case in chief at trial, without the defendant either objecting or requesting an

instruction to limit the purpose for which the evidence could be considered by the jury. At a pretrial hearing the trial court virtually invited defense counsel to object to this evidence, but counsel instead conceded its admissibility. Given that Priest did not seek to exclude this testimony or limit its use, we fail to perceive how mention of the testimony in the opening statement was egregious or how it had an inflammatory impact on the jury substantially different from that effected by their hearing the evidence at trial.

With respect to Priest's contention that the prosecutor's comments went beyond a recitation of the expected evidence and crossed the line into argument on the credibility of the State's witnesses, the comments were not so egregious or inflammatory that any prejudice arising therefrom could not have been remedied by a timely admonition of the trial court directing the jury to disregard the comments.

Accordingly, we conclude that alleged improprieties in the opening statement do not rise to the level of fundamental error.

### D. The prosecutor's comments at closing argument did not constitute fundamental error.

Priest also complains of prosecutorial misconduct during closing argument. He contends that the prosecutor personally vouched for the credibility of the State's witnesses in the italicized portions of the following excerpt from the State's closing argument.

And I guess the question that may be asked is, why should you believe these witnesses? But for a second I'd like to just turn it around a little bit. Why should you not believe these witnesses? *Have any of them in this courtroom on cross-examination been shown to be lying about what they told you? Have any of them been impeached? The answer is no, they haven't been. . . .*

What does Joe Taylor gain by lying? Does he get his tools back? Does he get money? Does he get charges dropped? Does he get revenge? What does he have to gain by making up that statement that he told you? We took a man up to the woods. We shot him. It was beautiful.

What does he gain? Didn't gain anything. So, again I submit Joe Taylor was not making up anything. *Joe Taylor was not lying.*

If they're going to lie, why didn't they lie better? Why didn't they get their stories perfectly straight? Why didn't they get their dates right? Why didn't they get the exact words perfectly right? Because that's human nature. People don't remember things exactly the way they happen all the time. But they do remember the general tenor of what goes on. So if these people came in and said "we don't remember the date," I would submit to you that is the—has the ring of truth. That has the ring of truth. *There is simply no reason to believe any of these people lied.*

▇▇▇ It is improper for a prosecutor to express a personal belief or opinion as to the truth or falsity of any testimony or evidence or as to the guilt of the defendant. *State v. Pizzuto,* 119 Idaho 742, 753, 810 P.2d 680, 691 (1991), *cert. denied,* 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 495 (1992), *overruled on other grounds, State v. Card,* 121 Idaho 425, 825 P.2d 1081 (1991); *State v. Garcia,* 100 Idaho, 108, 110, 594 P.2d 146, 148 (1979). Considerable latitude is allowed in closing arguments, however, and counsel are entitled to discuss fully, from their respective standpoints, the evidence and the inferences to be drawn therefrom. *Pizzuto,* 119 Idaho at 752, 810 P.2d at 690. This includes the right to express how, from that party's perspective, the evidence confirms or calls into the doubt the credibility of particular witnesses.

▇▇▇ In the context in which the challenged statements were made, it is apparent that the prosecutor was merely analyzing the evidence bearing upon witnesses' credibility and stating the conclusions which he urged the jury to draw therefrom. Contrary to Priest's argument, the prosecutor's comments do not imply that he was privy to information corroborating the witnesses' testimony that was unknown to the jury, or that he was personally vouching for the credibility of his witnesses. Therefore, we find no misconduct in the State's closing argument.

**E. The district court did not err in denying the defendant's motion for a new trial.**

After being found guilty by the jury, Priest filed a motion for a new trial on multiple grounds. Following an evidentiary hearing on this motion, the trial court denied Priest's request for a new trial. On appeal, Priest contends that he was entitled to a new trial due to: the district court's failure to adequately address the conflicts between Priest and his counsel, prosecutorial misconduct, ineffective assistance by defense counsel, and newly discovered evidence.

■ The grounds upon which a new trial may be granted are set out in I.C. § 19–2406.[2] The decision whether to grant a new trial rests in the sound discretion of the trial court. *State v. Lankford,* 116 Idaho 860, 873, 781 P.2d 197, 210 (1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990); *State v. Scroggins,* 110 Idaho 380, 384, 716 P.2d 1152, 1156 (1985), *cert. denied,* 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986). Therefore, we will not reverse the trial court's decision on such a motion absent a showing of abuse of discretion.

■ Two of the bases for a new trial urged by Priest, prosecutorial misconduct and ineffective assistance of counsel, are not among the grounds for a new trial delineated in I.C. § 19–2406. Therefore, these allega-tions present no basis for a new trial, and the district court did not err in denying Priest's motion on these claims. *See State v. Jones,* 127 Idaho 478, 481, 903 P.2d 67, 70 (1995) (trial court may not grant a new trial under I.C. § 19–2406 for prosecutorial misconduct); *State v. Gomez,* 126 Idaho 83, 86–87, 878 P.2d 782, 785–87 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 522, 130 L.Ed.2d 427 (1994) (ineffective assistance of counsel not a basis for new trial under I.C. § 19–2406).[3]

■ We consider next Priest's claim that he is entitled to a new trial because the court did not properly address the conflict between Priest and his attorneys. In view of our analysis in Section A above, we find no abuse of the trial court's discretion in denying the motion for a new trial on this ground.

■ The final basis urged by Priest for a new trial is newly discovered evidence. This is a ground upon which a new trial may be granted under I.C. § 19–2406(7). Therefore, we will review the trial court's exercise of its discretion on this aspect of Priest's motion. When newly discovered evidence is proffered as grounds for a new trial, the moving party must show:

(1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence be material, not merely cumulative or impeaching; (3) that it will probably produce

**2.** I.C. § 19–2406 states as follows:

When a verdict has been rendered against the defendant the court may, upon his application, grant a new trial in the following cases only: 1. When the trial has been had in his absence, if the indictment is for a felony. 2. When the jury has received any evidence out of court other than that resulting from a view of the premises. 3. When the jury has separated without leave of the court after retiring to deliberate upon their verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented. 4. When the verdict has been decided by lot or by any means other than a fair expression of opinion on the part of all the jurors. 5. When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial. 6. When the verdict is contrary to law or evidence.

7. When new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly-discovered evidence, the defendant must produce at the hearing in support thereof the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable.

**3.** This Court's decisions in *State v. Thomas,* 126 Idaho 299, 302–05, 882 P.2d 466, 469–71 (Ct. App.1994), where we addressed the merits of a claim of prosecutorial misconduct on appeal from the denial of a motion for a new trial, and *State v. Allen,* 123 Idaho 880, 853 P.2d 625 (Ct.App.1993), where we reversed the denial of a new trial motion based upon ineffective assistance of counsel, were effectively overruled by *Jones* and *Gomez.*

an acquittal; and (4) that the failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

The State's evidence at trial indicated that in October 1989, Priest had taken Stan Trineer into the foothills near Boise and shot him in the head. Priest's claim of newly discovered evidence is based upon affidavits of Daniel Stoddard and Jason Cotton. Stoddard was an inmate in the custody of the State Board of Correction. In his affidavit, executed about six months after Priest's trial, Stoddard stated that in July 1991, a person named John McKay told Stoddard that he, McKay, was with Trineer when Trineer died. According to the affidavit, McKay informed Stoddard as follows:

> McKay was with Snow Collett and Stan Trineer in a vehicle. The three of them had gone up the 8th Street Extension and into the hills to do a drug pickup and then proceeded to do the drugs they had just purchased (crank) and Stan Trineer overdosed in the car. Snow and McKay decided to dump Stan Trineer's body. The body was left in the area where they had done the purchase and the crank.

The affidavit went on to say that McKay was murdered about one week following this conversation. The second affiant, Jason Cotton, is Stoddard's brother. This affidavit indicates that he heard John McKay state that Priest did not kill Trineer. According to Priest, this evidence supports a theory that Snow Collett framed Priest by shooting Trineer's already dead body and then claiming to others that Priest confessed to her that he performed the killing.

The district court held that this evidence did not warrant a new trial because the statements attributed to McKay in these affidavits was inadmissible hearsay, I.R.E. 802, and because the affidavits were so lacking in

credibility that it was not probable that the evidence would produce an acquittal.

With respect to the hearsay issue, Priest argues that the affidavit would be admissible at trial under the hearsay exception of I.R.E. 804(b)(3), which provides:

> (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid a claim by declarant against another, that a reasonable man in declarant's position would not have made the statement unless declarant believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Priest asserts that McKay's alleged statement implicated McKay in drug offenses and therefore is admissible as a statement against interest under this rule.

 In our judgment, however, this hearsay does not fall within the Rule 804(b)(3) exception. Assuming, *arguendo*, that the declaration attributed to McKay is sufficiently self-incriminating to qualify as a "statement against interest,"[4] it remains inadmissible because it does not meet the test set out in the final sentence of Rule 804(b)(3). That test requires that a statement tending to expose the declarant to criminal liability and offered to exculpate an accused be supported by corroborating circumstances which

---

4. In interpreting the nearly identical federal rule of evidence in *Williamson v. United States*, 512 U.S. 594, ——, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476, 483 (1994), the United States Supreme Court held that this hearsay exception covers only those declarations or remarks that are individually self-inculpatory and does not make admissible non-inculpatory statements merely because they are made in the context of a larger discussion containing self-incriminating

components. If we were to apply this interpretation to I.R.E. 804(b)(3), McKay's alleged statement that Trineer "overdosed in the car" is not a statement against interest. Although McKay's alleged admissions about doing a "drug pickup" and using drugs are self-incriminatory, his statement as to how Trineer died is not. It is unnecessary for disposition of the present case, however, to decide whether to follow *Williamson* in interpreting I.R.E. 804(b)(3).

clearly indicate the trustworthiness of the statement. Priest argues that McKay's alleged statement is corroborated by evidence presented at trial that Trineer's body was found near the road known as the Eighth Street Extension in the Boise foothills. However, that fact has little or no corroborating value because McKay's statement to Stoddard was allegedly made in July 1991, more than a year after Trineer's body was located by police. Anyone with an interest in the case would have known where the body was found. The mere fact that Collett and Trineer were drug users does not "clearly indicate the trustworthiness" of McKay's description of Trineer's death. Therefore, the alleged hearsay statements of McKay would not have been admissible at a new trial.

In addition, the district court correctly found that the alleged newly discovered evidence, even if admissible, would not be likely to produce an acquittal. Priest was offering a second-hand account through a convicted felon and fellow inmate. The account, which did not surface until six months after Priest's trial, runs counter to the trial testimony of several witnesses other than Snow Collett who said Priest had told them he killed Trineer. Further, Priest's theory that Collett framed him appears implausible since she took no steps to report the matter to the police.

It is therefore our judgment that the motion for a new trial brought on the basis of newly discovered evidence was properly denied.

### F. The district court did not abuse its discretion in sentencing.

Priest next contends that the district court abused its discretion in sentencing him to a fixed life sentence upon his conviction for first degree murder.

▆▆▆▆ Appellate review of a sentence is based on an abuse of discretion standard. *State v. Wolfe*, 99 Idaho 382, 582 P.2d 728 (1978). The appellant has the burden to show that the sentence is unreasonable, and thus a clear abuse of discretion. *State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992). In reviewing a sentence, we take into account

the sentencing objectives of societal protection, deterrence, rehabilitation and retribution, *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982), and we conduct an independent examination of the record, focusing on the nature of the offense and the character of the offender. *State v. Young*, 119 Idaho 510, 808 P.2d 429 (Ct.App.1991); *State v. Reinke*, 103 Idaho 771, 653 P.2d 1183 (Ct.App.1982). No abuse of discretion will be found unless, in light of the governing criteria, the sentence was excessive under any reasonable view of the facts. *State v. Small*, 107 Idaho 504, 690 P.2d 1336 (1984).

Upon a conviction for first degree murder, the defendant may be sentenced to death, to a determinate life term in the custody of the Board of Correction or to a indeterminate life term with a minimum period of confinement as set by the sentencing court. I.C. § 18–4004. Here the district court chose a determinate life sentence, allowing for no possibility of parole.

In arguing that his sentence is too severe, Priest invokes the following statement from this Court's decision in *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct.App. 1988):

> [A] fixed life sentence may be deemed reasonable if the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence, or if the offender so utterly lacks rehabilitative potential that imprisonment until death is the only feasible means of protecting society. Unfortunately, in making these determinations, a judge has complete information only in regard to retribution and deterrence, which are based on the nature of the offense. The character of the offender is not completely known because it may evolve over time. The judge must attempt to predict the defendant's future response to rehabilitative programs and the degree of risk he might pose to society if eventually released.
>
> . . . .
>
> In our view, a fixed life sentence should not be regarded as a judicial hedge against uncertainty. To the contrary, a fixed life term, with its rigid preclusion of parole or

18

good time, should be regarded as a sentence requiring a high degree of certainty—certainty that the nature of the crime demands incarceration until the perpetrator dies in prison, or certainty that the perpetrator never, at any time in his life, could be safely released.

Priest argues that the nature of the crime in his case cannot be determined with certainty because there were no witnesses to the event. He also avers that rehabilitative potential exists because he suffers from an organic brain defect for which a treatment may one day be found.

■ We are unpersuaded by Priest's argument that the nature of the crime is uncertain. The jury was convinced beyond a reasonable doubt that Priest killed Trineer by shooting him in the head. The evidence indicated that the killing was carefully planned and that Trineer was shot while lying on the ground. In imposing sentence, the district court found that: "[T]he defendant was a cold-blooded pitiless killer who killed Stan Trineer to impress people and because of suspicion that Trineer was an informant. He bragged and showed off his murder. In sum, he assassinated a fellow criminal for suspicion and to show off his power." These findings are well supported by the trial evidence. Although the district court recognized that Priest suffered from an organic brain disorder that resulted in impairment of his impulse control and interfered with his ability to make proper moral decisions, the court nonetheless concluded that in light of the circumstances of the murder, "It is clear that the defendant should never again live in free society, and he will not."

After independent review of the record, we find no abuse of discretion in the district court's determination that the gravity of the offense, as shown by the circumstances of this case, justified a fixed life sentence. Because the very heinous nature of the crime warranted the sentence imposed, it is unnecessary to address Priest's contention that the possibility of rehabilitation should not be entirely excluded.

■ Priest also contends that the district court abused its discretion in denying

his motion for reduction of the sentence pursuant to I.C.R. 35. A motion to reduce a sentence is essentially a plea for leniency addressed to the sound discretion of the sentencing court. *State v. Wersland,* 125 Idaho 499, 504, 873 P.2d 144, 149 (1994); *State v. Forde,* 113 Idaho 21, 22, 740 P.2d 63, 64 (Ct.App.1987). The standards for reviewing denial of such a motion are the same as those used in evaluating whether the original sentence was excessive. *State v. Shiloff,* 125 Idaho 104, 107, 867 P.2d 978, 981 (1994); *State v. Snapp,* 113 Idaho 350, 351, 743 P.2d 1003, 1004 (Ct.App.1987). If the sentence was reasonable when originally imposed, the defendant must show that it is excessive in light of new or additional information presented with the motion for reduction. If the defendant fails to make this showing, we cannot say that denial of the motion constitutes an abuse of discretion. *Shiloff,* 125 Idaho at 107, 867 P.2d at 981; *State v. Hernandez,* 121 Idaho 114, 117–18, 822 P.2d 1011, 1014–15 (Ct.App.1991).

■ We have found the sentence reasonable as originally imposed, and Priest acknowledges that no additional evidence was presented in support of his Rule 35 motion. Accordingly, there was no abuse of discretion in the district court's denial of Priest's motion for reduction of the sentence.

## G. Conclusion.

The judgment of conviction and sentence and the orders denying Priest's motions for a new trial and for reduction of the sentence are affirmed.

WALTERS, C.J., and PERRY, J., concur.