946 P.2d 71

**Darin Jay MILBURN, Petitioner–Appellant,**

v.

**STATE of Idaho, Respondent.**

No. 22522.

Court of Appeals of Idaho.

Oct. 3, 1997.

Anderson Law Office, Boise, for petitioner–appellant.

Alan G. Lance, Attorney General; Catherine O. Derden, Deputy Attorney General, Boise, for respondent.

LANSING, Chief Judge.

This is an appeal from a district court's order summarily dismissing an application for post-conviction relief which asserted, *inter alia*, a claim of ineffective assistance of counsel. Because we conclude that the applicant's evidence raises factual issues regarding the adequacy of the legal representation he received during his criminal trial, we reverse the district court's order dismissing the application.

## I

## BACKGROUND

In April 1992, Darin Milburn was charged with first degree murder for the shooting death of Carey Shaddy. A jury found Milburn guilty of second degree murder, and he was sentenced to life in prison with a twelve-year minimum term of confinement. Following sentencing, Milburn filed a motion for new trial, arguing that his defense attorneys had not provided effective representation in pretrial preparation and at trial. After an evidentiary hearing at which extensive evidence was presented relating to the defense attorneys' performance, the district court denied Milburn's motion for new trial. Milburn then filed an appeal from the judgment of conviction and from the district court's denial of his motion for new trial. The appeal was dismissed, however, pursuant to I.A.R. 21 after Milburn failed to file an appellate brief.

Subsequently, Milburn filed an application for post-conviction relief, again alleging that he had been denied effective assistance of counsel and also claiming police and prosecutorial misconduct. The State moved for summary dismissal of the post-conviction application pursuant to I.C. § 19–4906(c), urging that Milburn's claims were barred by *res judicata* and by the terms of I.C. § 19–4901(b). In response to the motion, Milburn's post-conviction counsel informed the court that Milburn did not wish to relitigate the ineffective assistance of counsel issue that had been presented on the motion for a new trial and that Milburn therefore would rely upon the record made at the evidentiary hearing on that motion as his evidence supporting the ineffective assistance claims in the post-conviction action. He advised the court that he was incorporating the ineffective assistance of counsel cause of action into the post-conviction proceeding "to preserve it for appeal." The district court concluded that Milburn's ineffective assistance of counsel claims were barred, as the State argued. As an alternative basis for the dismissal the court also reiterated its holding, made on the same evidentiary record in response to Milburn's motion for a new trial, that Milburn had not proved ineffective assistance of counsel. As to the remainder of Milburn's post-conviction claims the district court held that they were not supported by evidence. Therefore the State's motion for summary disposition was granted. This appeal followed.

## II

## ANALYSIS

### A. Standard of Review

An application for post-conviction relief initiates a special proceeding in which the appli-

cant bears the burden of proof. *State v. Bearshield,* 104 Idaho 676, 678, 662 P.2d 548, 550 (1983); *Nielson v. State,* 121 Idaho 779, 780, 828 P.2d 342, 343 (Ct.App.1992); *Murray v. State,* 121 Idaho 918, 921, 828 P.2d 1323, 1326 (Ct.App.1992). An action for post-conviction relief may be summarily dismissed, either upon the motion of a party or upon the court's own initiative. I.C. § 19–4906, *Martinez v. State,* 126 Idaho 813, 816, 892 P.2d 488, 491 (Ct.App.1995). Summary dismissal is permissible, however, only when the evidence raises no genuine issue of material fact which, if resolved in the applicant's favor, would entitle the applicant to the requested relief. If such a factual issue is framed, an evidentiary hearing must be conducted. *Gonzales v. State,* 120 Idaho 759, 763, 819 P.2d 1159, 1163 (Ct.App.1991); *Hoover v. State,* 114 Idaho 145, 146, 754 P.2d 458, 459 (Ct.App.1988); *Ramirez v. State,* 113 Idaho 87, 89, 741 P.2d 374, 376 (Ct.App.1987). Therefore, on appeal we examine the record to determine whether the trial court correctly found that there existed no genuine issue of material fact and that the State was entitled to judgment as a matter of law. *Remington v. State,* 127 Idaho 443, 446, 901 P.2d 1344, 1347 (Ct.App.1995); *Hoover,* 114 Idaho at 146, 754 P.2d at 459. The record upon which we base our review in this case includes the transcript of Milburn's criminal trial, the transcript of the evidentiary hearing on his motion for a new trial, Milburn's verified application for post-conviction relief, and affidavits filed in the post-conviction action.

**B. Milburn's Claims Are Not Procedurally Barred**

■ We must first address the State's contention that, as the district court held, Milburn is barred from raising his ineffective assistance of counsel claim. The State argues that the dismissal of Milburn's direct appeal rendered the underlying district court decision denying the motion for new trial, including the ineffective assistance of counsel claim, final for purposes of *res judicata.* The State also contends that Milburn is precluded from raising this claim by terms of I.C. § 19–4901(b). That section states in part:

> Any issue which could have been raised on direct appeal, but was not, is forfeited and may not be considered in post-conviction proceedings, unless it appears to the court, on the basis of a substantial factual showing by affidavit, deposition or otherwise, that the asserted basis for relief raises a substantial doubt about the reliability of the finding of guilt and could not, in the exercise of due diligence have been presented earlier.

According to the State, because Milburn's ineffective assistance of counsel claim was initially addressed on his motion for a new trial and could have been pursued on direct appeal, it cannot be reasserted in a post-conviction action.

We conclude that the State's argument is without merit. A similar circumstance was considered by the Idaho Supreme Court in *Parrott v. State,* 117 Idaho 272, 274, 787 P.2d 258, 260 (1990). Parrott had been found guilty of a felony and thereafter filed a motion for a new trial based on ineffective assistance of counsel. The new trial motion was denied and Parrott appealed, but he later withdrew the appeal. Parrott then filed an application for post-conviction relief based primarily upon allegations of ineffective assistance of counsel. His post-conviction action was summarily dismissed. On appeal from that dismissal order, the Supreme Court considered whether the post-conviction action was barred because the same claim of ineffective assistance had been determined on his motion for a new trial. The Court held:

> Since Parrott's first appeal was withdrawn before briefing or oral argument, the issue of ineffective assistance of counsel has not been considered by this Court. Accordingly, the earlier appellate proceeding has no *res judicata* effect on Parrott's post conviction relief proceedings. We may therefore consider the merits of Parrott's petition.

*Id.* at 274, 787 P.2d at 260. The State contends that Milburn's case is distinguishable from *Parrott* because Milburn's direct appeal was not voluntarily withdrawn but, rather, was dismissed for failure to file an appellate

brief.[1] We find no significance in this distinction, however, because the dismissal of the direct appeal, whether voluntary or not, forestalled consideration of the ineffective assistance of counsel claims by an appellate court.

There is a further reason that the order denying Milburn's motion for a new trial and the abandoned direct appeal should not be viewed as a bar to his post-conviction action. Milburn's alleged right to relief for ineffective assistance of counsel could not properly be presented on a motion for a new trial. The exclusive grounds upon which a new trial may be granted are set forth in I.C. § 19-2406. *See State v. Davis,* 127 Idaho 62, 65, 896 P.2d 970, 973 (1995); *State v. Jones,* 127 Idaho 478, 481, 903 P.2d 67, 70 (1995); *State v. Gomez,* 126 Idaho 83, 86, 878 P.2d 782, 785 (1994). Ineffective assistance of counsel is not among those grounds for a new trial delineated in that statute. Consequently, a motion for a new trial could not properly have been granted on that basis, and the trial court ought not have entertained that aspect of Milburn's motion for a new trial. *Gomez,* 126 Idaho at 86, 878 P.2d at 785. *See also State v. Roberts,* 129 Idaho 194, 197, 923 P.2d 439, 442 (1996); *State v. Priest,* 128 Idaho 6, 15, 909 P.2d 624, 633 (Ct.App.1995). The appropriate means to present an ineffective assistance claim is an application for post-conviction relief. *Roberts, supra; Murray,* 121 Idaho at 924-25, 828 P.2d at 1329-30. Because Milburn's motion for a new trial was not a correct vehicle to pursue his claim for ineffective assistance of counsel, the merits of his claim would not have been addressed by an appellate court even if Milburn had not abandoned his direct appeal. As in *Roberts,* the appellate court would have merely affirmed the denial of the motion on this procedural basis (and perhaps also would have suggested pursuit of the claim by an action for post-conviction relief as the Court did in *Roberts* ). Therefore, the State's argument that Milburn's claim of ineffective assistance of counsel could have been raised on direct appeal is erroneous.

## C. Ineffective Assistance of Counsel Claim Should Not Have Been Summarily Dismissed

The right of a criminal defendant to counsel is guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 13 of the Idaho Constitution. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Carter v. State,* 108 Idaho 788, 794, 702 P.2d 826, 832 (1985). This is a right to more than the mere presence of a lawyer at trial; it is the right to effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 685-686, 104 S.Ct. 2052, 2063-2064, 80 L.Ed.2d 674 (1984); *Ivey v. State,* 123 Idaho 77, 80, 844 P.2d 706, 709 (1992); *Aragon v. State,* 114 Idaho 758, 760-61, 760 P.2d 1174, 1175-76 (1988); *Carter, supra.* It means that an accused "is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." *State v. Tucker,* 97 Idaho 4, 8, 539 P.2d 556, 560 (1975). *See also State v. McCabe,* 101 Idaho 727, 728, 620 P.2d 300, 301 (1980); *Huck v. State,* 124 Idaho 155, 157-58, 857 P.2d 634, 636-37 (Ct.App.1993).

To prevail on a claim of ineffective assistance of counsel, an applicant must satisfy a two-part test. The applicant must prove, first, that the attorney's performance was deficient and, second, that the applicant was prejudiced by the deficiency. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Hassett v. State,* 127 Idaho 313, 316, 900 P.2d 221, 224 (Ct.App.1995); *Russell v. State,* 118 Idaho 65, 67, 794 P.2d 654, 656 (Ct.App.1990). There is a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance, and to prove deficiency the applicant must show that counsel's representation fell below an objective standard of reasonableness. *Aragon,* 114 Idaho at 760, 760 P.2d at 1176 (1988); *Gabourie v. State,* 125 Idaho 254, 256, 869 P.2d 571, 573 (Ct.App.1994); *Russell,* 118 Idaho at 67, 794 P.2d at 656. In order to establish prejudice, the applicant must demonstrate that there is a reasonable probability that, but for the attorney's inadequate

---

1. According to Milburn's current attorney, he purposefully allowed the appeal to be dismissed in order to pursue his rights under the Uniform Post-Conviction Procedure Act, I.C. §§ 19-4901 to -4911.

performance, the outcome of the trial would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Aragon,* 114 Idaho at 761, 760 P.2d at 1177; *Russell, supra.* In evaluating whether prejudice is proved, the court "must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068; *State v. Fee,* 124 Idaho 170, 173, 857 P.2d 649, 652 (Ct.App.1993).

Our review of Milburn's claims requires a close examination of the evidence, both the evidence which was presented at trial and that which was not. The investigation that ultimately led to Milburn's conviction began on April 11, 1992, when a body was discovered in a recently burned irrigation ditch near the town of Middleton. The body, which was later identified as that of twenty-two-year old Carey Lynn Shaddy, was charred and had three gunshot wounds. Police estimated that the murder occurred sometime prior to April 2, 1992. This determination was based in part on evidence suggesting that the body was in the irrigation ditch when the ditch was burned. The farmer who had burned the weeds in the ditch said the fire was set on April 2, which was confirmed by rental records showing that on that date the farmer had returned rented equipment used to clear the ditch. The date of death was also substantiated by the report of an entomologist who rendered an opinion, based on the growth of fly larvae found on the corpse, that the death had occurred on or before April 2.

The Canyon County Sheriff's Department conducted an extensive investigation involving more than one hundred interviews. Ultimately, Darin Milburn was arrested for the killing and was charged with first degree murder, I.C. §§ 18–4001, –4003(a). The Canyon County Public Defender's office was initially appointed to represent Milburn. Later, attorneys Klaus Wiebe and Scott Fouser were substituted as his appointed counsel.

In January 1993, a jury trial was conducted. The prosecutor's case against Milburn was built on three components: (1) evidence that Milburn was the last person to be seen with Shaddy prior to the asserted date of Shaddy's death; (2) ballistics tests that identified Milburn's .44 caliber hand gun as the murder weapon; and (3) testimony that Milburn had told an acquaintance, Christopher Pickering, that he had killed someone in Middleton. Milburn's attorneys did not present any evidence following the State's case-in-chief, but tendered a defense through cross-examination of the State's witnesses. The jury returned a verdict finding Milburn guilty of second degree murder, I.C. §§ 18–4001, –4003(g).

■ Milburn contends that Wiebe and Fouser's performance as defense counsel was deficient in several respects. He maintains that the attorneys had not reviewed many of the police investigation records or interviewed key witnesses and that, as a consequence, they failed to utilize a mass of available evidence that would have disproved or severely undercut two of the three prongs of the prosecution's case and also failed to present exculpatory evidence that would have undermined the State's theory and pointed to a different suspect. We will address each category of the allegedly exculpatory evidence that was not used by Milburn's attorneys.

### 1. Evidence that Milburn Was Not the Last Person with Victim on the Night of March 31.

To show that Milburn was the last person to see Carey Shaddy alive, the prosecution offered the testimony of a bartender who worked at the Chaparral Bar in Middleton. She testified that Milburn and Shaddy left the bar together at about 11:30 p.m. on March 31, 1992, after Milburn had offered to give Shaddy a ride home. The bartender also testified that she watched the two men get into Milburn's vehicle before she finally looked away. It was the State's theory that Milburn killed Shaddy shortly after leaving the bar.

Milburn, however, always maintained that he refused to give Shaddy a ride that night. The jury heard Milburn's account through an officer who testified about Milburn's statements to the police. Milburn contended that once the two men left the bar, Shaddy told Milburn that he wanted a ride to Caldwell, a town several miles away. Milburn said that

he was not willing to drive Shaddy that far because he was afraid of getting stopped for driving under the influence of alcohol. Milburn told police that he left Shaddy in the parking lot, and that the last time Milburn saw him, Shaddy was walking down the street away from the bar.

In his application for post-conviction relief, Milburn alleged that his attorneys were deficient in failing to present available evidence which substantiated his version of the events of that night. Milburn relies on evidence that Jerry Perry, a Middleton man, heard another man, Tim Dubose, state that he, Dubose, had given Carey Shaddy a ride home from the bar that night. This information would have supported Milburn's story and refuted the prosecution's assertion that Milburn was the last person known to have been with Carey Shaddy. Although information regarding Dubose's alleged statement was contained in police reports and was available to Milburn's attorneys before trial, the evidence indicates that they made no attempt to discuss the matter with either Perry or Dubose.

We find in the record no explanation why such potentially exculpatory and easily obtainable information was not pursued. Both Wiebe and Fouser admitted that they had not read every police report of witness interviews. We can only infer that the report regarding Dubose's statement was among those that they omitted to read or that the attorneys read the report but failed to grasp its significance. In either event, their neglect to pursue the information and to investigate its potential value in tendering a defense raises a serious question regarding the vigor and competence of their representation of Milburn.

▮ Defense attorneys do not have a duty to interview all potential witnesses. *State v. Bingham*, 116 Idaho 415, 424, 776 P.2d 424, 433 (1989); *State v. Dye*, 124 Idaho 250, 258, 858 P.2d 789, 797 (Ct.App.1993). Imposing such a mandatory duty "would needlessly restrict their judgment as to which witnesses should be interviewed and when." *Bingham, supra*. However, as the Court stated in *Bingham*, under some circumstances such a failure can constitute a

deficiency in representation. "[E]ach case must be judged according to the significance of the evidence the witness has to offer and what other sources are available to ascertain the testimony of the witness." *Bingham*, 116 Idaho at 424, 776 P.2d at 433. *See also Dye, supra*. In view of the potential importance of information held by Perry and Dubose to disprove one of the three components of the State's case against Milburn, we conclude that it was patently unreasonable for Milburn's counsel not to pursue the matter with either witness.

## 2. Impeachment of Pickering

Next, Milburn contends that there is a genuine factual issue as to whether his trial attorneys acted unreasonably when they failed to use evidence that would have impeached one of the prosecution's critical witnesses, Christopher Pickering. At trial, Pickering testified that Milburn had disclosed to Pickering that Milburn "killed somebody over in Middleton." Milburn asserts that this testimony went nearly unchallenged by the defense despite an abundance of information which could have been used to impeach Pickering.

The record indicates that when Pickering was first approached by police on April 29, 1992, he told them essentially the same story to which he ultimately testified at trial. Pickering stated that on the afternoon of April 7, 1992, while he and Milburn were walking down a road, Milburn commented that he had would like to move to Alaska because he had killed someone in Middleton. Pickering also told police that at the time the statement was made, he thought Milburn was joking, and that it was only after Shaddy's body was discovered and the newspapers began reporting on the crime that he took the statement seriously. On further questioning during his first police interview, Pickering said that he knew nothing else about the murder but that his wife, Dawn Hogan, could tell the police more because she and Milburn had had a long talk about the murder.

When police interviewed Dawn Hogan, however, she denied ever having such a con-

versation with Milburn. Even under intense pressure from the police, which involved direct threats of prosecution as an accomplice if she would not cooperate, seventeen-year-old Hogan maintained that she never had a conversation with Milburn regarding the murder. She indicated that she had not even heard about Milburn's possible involvement in the murder until the night before the interview when Pickering himself told her that Milburn had committed the crime. She also indicated that she and Pickering were not married, contrary to what Pickering had told police, and that they did not, as he maintained, have a child together.

In his first statement to the police, Pickering also implicated Jim Lacey, Milburn's uncle, in the murder. Pickering said that shortly after Milburn referred to having killed someone, Pickering overheard a conversation between Milburn and Lacey from which Pickering gained the impression that Lacey had been present when the murder occurred. He said that Lacey asked if Milburn had cleaned the gun and honed out the gun's barrel.[2]

When Pickering was called as a witness at the preliminary hearing, his story changed. At that hearing Pickering repeatedly denied ever hearing Milburn make a statement about a murder in Middleton. Then, a few days after the preliminary hearing, Pickering reportedly told yet another version of the events related to the murder. Two friends of Pickering, Anora Baxter and Vicky Boyd, told police that Pickering had given them detailed information about how the murder had occurred while Shaddy, Milburn, and another man were gopher hunting, that the gun held by the police was not the actual murder weapon, and that the true murder weapon had been in Pickering's car before the murder. When Pickering was confronted by police about his statements to Baxter and Boyd, he denied making them. Pickering claimed that anything he did tell the women about the murder he heard from Hogan.

Attorney Wiebe's cross-examination of Pickering at trial consisted of a question as to why Pickering told the police he was married to Hogan and very brief questioning about Pickering's failure to implicate Milburn at the preliminary hearing. Wiebe did not interrogate Pickering about any of the other inconsistencies in his various statements, and the defense attorneys did not call any witnesses to impeach Pickering.

At the hearing on the motion for new trial, Wiebe testified that his decision not to call Hogan to impeach Pickering was a tactical one made after he interviewed her. He explained that Hogan's testimony might have bolstered Pickering's claims because she would have testified that Pickering became emotional and nervous once Shaddy's body was discovered. Wiebe felt this would lead the jury to believe Pickering was being truthful when he said he was afraid of Milburn. This amounts to an informed tactical decision that should not be second-guessed in the consideration of an ineffective assistance of counsel claim. *See Roman v. State*, 125 Idaho 644, 650, 873 P.2d 898, 904 (Ct.App. 1994); *Fee*, 124 Idaho at 173, 857 P.2d at 652; *Davis v. State*, 116 Idaho 401, 406, 775 P.2d 1243, 1248 (Ct.App.1989). However, we do not find any similar justification in the record for Wiebe's failure to impeach Pickering with the other available information. Wiebe admitted that he had not read the statements given to the police by Boyd and Baxter, and hence could not have had any tactical reasons not to impeach Pickering with the highly detailed statements he made to them, which contradicted his statements to police.

Moreover, Wiebe failed to point out many of the internal inconsistencies present in Pickering's own statements to police which raise doubt regarding his credibility. For example, in his first interview with Detective Dennis Black of the Canyon County Sheriff's Office, Pickering said that he thought Milburn was joking when he admitted to the murder. After repeated questions from Black, Pickering unwaveringly maintained that Milburn acted as though the confession was only a joke and that Milburn did not make any further statements alluding to the murder after his initial comment. Pickering said he believed it was a joke until the day he heard that a body was discovered near Mid-

---

**2.** Lacey denied having participated in such a   conversation.

dleton. However, during his next interview with Detective Black, Pickering claimed that Milburn had threatened him in the same conversation after admitting to the murder. Pickering told Black that Milburn said, "[You had] better keep your mouth shut, or [you'll] be next." Other portions of Pickering's statements to police are also inconsistent with his contention that he thought Milburn was joking. He told police that on the same day that Milburn admitted the killing, Pickering overheard Milburn and Lacey talking about the shooting and making plans to alter the gun. This part of Pickering's account contradicts his assertion that he believed Milburn was joking until days later when the murder was reported in the newspapers.

Pickering's testimony that Milburn had admitted to killing someone in Middleton was central to the prosecution's case. On the record that is before us, genuine factual issues exist regarding whether the performance of Milburn's attorneys fell below a reasonable standard when they failed to consider or employ available evidence to impeach Pickering's testimony.

### 3. Evidence of Wes Huskey's Admissions

In addition to asserting that his trial counsel unreasonably failed to investigate and utilize available evidence to refute key elements of the prosecution's case, Milburn also contends that his attorneys unreasonably omitted to present other relevant and exculpatory evidence at trial. Specifically, Milburn argues that his defense counsel acted unreasonably when they chose not to present an alternative theory of the case implicating another individual in Shaddy's murder.

Two days before the newspapers began reporting on the discovery of Shaddy's body, an employee of a bar in Middleton told police that a man named Wes Huskey admitted to committing a murder. She reported that Huskey entered the bar on the 8th or 9th of April and told people in the bar that he had shot a twenty-two-year-old man. The witness said that she could see blood on Huskey. A patron of the bar also told police that Huskey came into the bar looking "really nervous," that he had blood on his cheek, and

that he admitted to shooting somebody. According to this witness, Huskey said he was afraid that he had killed the wrong person. A third person who was also in the bar confirmed that Huskey said "I just shot somebody ... I don't know but it think it was the wrong guy." When the police asked this witness if she believed Huskey's story, she said "Oh, yeah. He was as white as a ghost."

Later, when police interviewed Husky he denied killing anyone. However, he admitted that someone had offered to pay him $5,000 to kill a man, D.E. Huskey's ex-wife also told police that Huskey had made comments to several people that he was going to kill D.E. and D.E.'s father. The record also indicates that a man identifying himself as Wes Huskey on two occasions called the Port of Hope, a substance abuse treatment facility, and said he had killed "the wrong man."

At trial, the only information regarding Wes Huskey was presented during Wiebe's cross-examination of detective Black as follows:

Wiebe: Mr. Black, within a real short time of finding the body, you had information that there was a man in Middleton bragging about actually shooting somebody by mistake; is that right?

Black: Yes, sir.

Wiebe: Did you check that out?

Black: Yes, sir, I did.

Wiebe: You discovered that it was a man named Wes Huskey?

Black: Yes, sir.

Wiebe: Who lives there in the Middleton area?

Black: Yes, sir.

Wiebe: What did you do to check Mr. Huskey out?

Black: I interviewed him. I interviewed witnesses, people that supposedly heard him make the statement.

. . . .

Wiebe: So, you got Wes in there?

Black: Yes, sir.

Wiebe: And he said what? "I didn't do it"?

Black: Yes, sir.

Wiebe: And then what did you do?

Black: Then I gave him a test.

Wiebe: You gave him a lie detector test, right?

Black: Yes, sir.

Wiebe: Are lie detector tests admissible in court? They're not admissible in court. You know that.

Black: Yes, sir.

Wiebe: That's because they're not totally accurate, right?

....

Wiebe: Did you check—did he have an alibi for that night?

Black: I don't believe so.

Wiebe: You didn't check him out?

Black: I checked him out.

Wiebe: With this test?

Black: Yeah, he passed the polygraph.

Wiebe: Yeah, that's all? You didn't say, "Okay. Let's have an alibi here. Where were you that night, Buddy?"

Black: Well, we tried to run it down but we couldn't locate anybody that confirmed it.

Wiebe: He didn't have an alibi for that night did he?

Black: I don't know. As far as I'm concerned no, he didn't.

Thus, all the jury learned about Wes Huskey was that there had been a man in Middleton "bragging about actually shooting somebody by mistake." Even this slight evidence about Huskey's admissions was diminished when defense counsel also elicited testimony that Huskey had passed a polygraph test, testimony prejudicial to Milburn which the State probably would not have been allowed to introduce due to the unreliability of such tests. *See State v. Grube*, 126 Idaho. 377, 385, 883 P.2d 1069, 1077 (1994); *State v. Fain*, 116 Idaho 82, 86–7, 774 P.2d 252, 256–57 (1989).

At the hearing on Milburn's motion for new trial, Milburn's post-conviction counsel,

while examining Wiebe, highlighted the evidence against Huskey, including Huskey's admission to three people that he had killed a man; the observations of these three witnesses that Huskey had fresh blood on him and that he looked upset and agitated; Huskey's statement that the person he killed was twenty-two years old, the same age as Carey Shaddy; Huskey's admission to police that someone had attempted to hire him to kill a young man; his ex-wife's statement to police that Huskey had said he was going to kill D.E.; Huskey's statement to the people in the bar that he had killed the wrong man; the Port of Hope's report that a man identifying himself as Wes Huskey had called twice to say he had killed the wrong man; and the fact that all of this occurred three to four days before Shaddy's body was discovered. Wiebe was then asked: "Do you think this sequence of events put together in front of a jury would have been important for them to know?" Wiebe responded: "I don't know how you tie it into this thing."

There is no further direct explanation of defense counsel's decision not to develop the evidence of Wes Huskey's revelations. There is, however, evidence from which one could infer that Wiebe and Fouser decided not to use this evidence because of the time discrepancy between the date of Shaddy's death as determined by the State and the date of Huskey's admission. Wiebe indicated early in his testimony that the defense team had decided not to present any information at trial which would challenge the State's evidence regarding the date of Shaddy's death. They concluded that the State's date of death evidence was so persuasive that any attempt to contradict it would destroy their credibility with the jury. Wiebe gave this rationale to explain their decision not to call at least three witnesses who had told police that they saw Shaddy several days after the claimed date of death, and thus several days after Shaddy was seen leaving the Chaparral Bar with Milburn.[3]

**3.** Each witness was unrelated to Milburn and had a specific reason for being certain of the date upon which he or she saw Shaddy alive after April 1. One of the witnesses, an ex-girlfriend of Shaddy's, said that she saw him at a car wash on

April 3, 1992. She was certain of the date because at the time of the encounter she was on her way to a concert held in Boise on that date. The second witness, an employee of a gas station and convenience store located in Middleton, told

The decision not to present the full scope of the evidence against Wes Huskey, if based upon a desire not to controvert the evidence on Shaddy's date of death, could be termed a matter of trial strategy. In reviewing a claim of ineffective assistance, a court ordinarily will not second-guess *informed* strategic and tactical choices made by trial counsel. *See Tucker*, 97 Idaho at 10, 539 P.2d at 562 (1975); *Fee, supra; Davis v. State*, 116 Idaho at 406, 775 P.2d at 1248. However, "when counsel's trial strategy decisions are made upon the basis of *inadequate preparation*, ignorance of the relevant law, or other shortcomings capable of objective evaluation, the defendant may well have been denied the competent assistance of counsel." *Tucker*, 97 Idaho at 10, 539 P.2d at 562 (emphasis added). Moreover, "even errors in strategy can be so grave that they represent circumstances in which an issue of ineffective assistance exists." *State v. Walters*, 120 Idaho 46, 58, 813 P.2d 857, 869 (1991) (Boyle, J., concurring).[4]

The record in this case suggests that any decision not to present more detailed evidence about Huskey's admissions was made in ignorance of much of the evidence. Attorney Wiebe testified that he could not remember whether he interviewed Huskey or any of the witnesses who told police that Huskey had admitted to the murder. In fact, Wiebe's lack of familiarity with the police statements of several witnesses indicates that he did not even review all of the police reports associated with the investigation of Huskey. Defense counsel also did not interview two of the three then-known witnesses who could have testified that Shaddy was alive during the week after April 2 and thus could have been Huskey's victim. Even if defense counsel's election to forego using the

extensive evidence of Wes Huskey's admissions to having murdered a twenty-two-year-old man within a few days' prior to the discovery of Shaddy's body was a tactical one, the record before us indicates that the decision was made without adequate preparation and may have been such a grievous error as to amount to deficient representation. On the record before us, this claim that counsel unreasonably failed to use exculpatory evidence cannot properly be summarily dismissed on the basis that counsel's decision was one of "trial strategy."

### 4. Prejudice

We have held that the evidence on Milburn's ineffective assistance of counsel claims raises serious questions as to whether his attorneys were constitutionally deficient in failing to investigate information that Tim Dubose gave Shaddy a ride home on the night of March 31 after Milburn and Shaddy had parted company, in failing to cross-examine Pickering with his own inconsistent statements regarding Milburn's alleged confession or to interview other witnesses who could impeach Pickering, and in failing to present evidence on the circumstances of Wes Huskey's admissions to shooting a twenty-two-year-old man a few days before Shaddy's body was discovered. However, in order to be entitled to relief, one claiming ineffective assistance of counsel must show not only that the attorney's performance fell below reasonable standards of professional conduct but also that the attorney's deficiency prejudiced the client's defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Hassett*, 127 Idaho at 316, 900 P.2d at 224; *Russell*, 118 Idaho at 67, 794 P.2d at 656. To satisfy the prejudice element, an applicant must show a reasonable probability that, but for the attorney's

---

police that she talked to Shaddy while she was at work sometime between the 5th and 7th of April. She could place the sighting between those dates based on her work schedule. A third sighting by a former schoolmate of Shaddy's took place at the same gas station. This witness reported speaking with Shaddy at about 5 p.m. on April 7. He was confident about the date of this conversation because he was home from college during that time and had saved his gas receipt, which had the date and time on it. Only one of these witnesses was interviewed by defense counsel.

In the hearing on his new trial motion, Milburn also presented the testimony of three more people who claimed to have seen Shaddy on or about April 7, 1992. However, these witnesses were not identified in police reports and Milburn does not assert that his attorneys were deficient in failing to discover them.

4. Justice Boyle's concurring opinion issued on rehearing was joined by two other justices and thus presented the view of a majority of the Idaho Supreme Court.

unprofessional errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Aragon v. State*, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988); *Davis*, 116 Idaho at 406, 775 P.2d at 1248. This does not require proof that counsel's errors more likely than not altered the outcome of the case. *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067; *Nix v. Whiteside*, 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986). Rather, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. The ultimate benchmark is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. In assessing the potential prejudice in Milburn's case, we will consider in aggregate the various decisions and omissions of defense counsel that are alleged to have been unreasonable. We also take into account the totality of the evidence that was before the jury in the criminal trial. *See Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.

As noted earlier, the State presented a three-pronged case identifying Milburn as Shaddy's killer. We have seen that two of the three prongs, the State's evidence that Milburn was the last person seen with Shaddy before the latter's death and Christopher Pickering's testimony that Milburn had admitted to killing someone in Middleton, might have been significantly undercut if Milburn had received the diligent representation to which he was entitled. In addition, the evidence that Wes Huskey, in the pres-

ence of three people and with blood on his body, had confessed to the shooting of a man of Shaddy's age in the same general vicinity and the same general time frame in which Shaddy was killed also could have so changed the complexion of the case as to lead to a different verdict.[5]

The State's ballistics evidence identifying Milburn's gun as the murder weapon is not refuted by any of Milburn's evidence in this post-conviction action. We are not confident, however, that the ballistics evidence alone, with other components of the State's case seriously compromised, would have led the jury to find Milburn guilty. We also recognize that compelling evidence that Shaddy died on or about April 1, 1992, might have led a jury to reject a defense theory that Wes Huskey could have been the perpetrator. However, it is not our role, nor that of the trial court in a post-conviction relief action, to determine what the jury *would have* found, nor to make our own assessment of Milburn's guilt or innocence. We need only assess "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069. On the record before us we conclude that Milburn has made a prima facie showing that the result of his trial is unreliable due to constitutionally deficient performance by his counsel.

Because of the procedural posture of this case, we do not hold that Milburn is entitled to a new trial. The matter has come to us on

---

5. At the hearing on his motion for a new trial, Milburn presented additional evidence that may be exculpatory. In a police interview, a Middleton man, S.W., said that he had information that Shaddy had been in an argument with his girlfriend, Cybil Dean, and her son at Dean's residence sometime between April 5 and April 7. After the trial, Milburn's new attorney found another individual who corroborated this information. He testified at the hearing on Milburn's motion for a new trial that on April 5 or 6, 1992, he saw Shaddy in a heated argument with three or four people in front of Dean's home and saw him again two days later when Shaddy returned to pick up a car parked at Dean's house. Milburn's post-conviction attorney also discovered two other witnesses who lived near Dean. They

testified at the hearing on the new trial motion that they heard shots late at night on about April 7. The first neighbor testified that he heard three shots from what sounded like a high caliber hand gun or rifle. He said he also heard a voice say something like, "Help me get the son of a bitch in the car." The second neighbor similarly testified to hearing three shots and hearing someone say, "Hurry up, get the son of a bitch in." The information from these witnesses other than S.W. does not appear in police reports, and Milburn does not rely upon counsel's failure to discover these witnesses as a part of his claim for ineffective assistance. Therefore, we do not rely upon this evidence in evaluating Milburn's claim of entitlement to relief for ineffective assistance of counsel.

appeal from a summary dismissal of Milburn's application. The order of summary dismissal will be reversed, and on remand the parties must be afforded an opportunity for an evidentiary hearing if either party wishes to present additional evidence.

### D. Milburn's other claims

In addition to his claims related to the performance of his trial attorneys, Milburn also asserts ineffective performance by an attorney who was later replaced by Wiebe and Fouser. The district court concluded that this allegation was not supported by the evidence. We agree. There is no evidence whatsoever in the record to substantiate Milburn's claims regarding this attorney.

█ Lastly, Milburn contends that he is entitled to post-conviction relief because the police and prosecutors willfully withheld exculpatory evidence from the defense. This allegation is based on the affidavit of the Canyon County Coroner Vickie DeGeus, who stated that a detective told her before Milburn's trial that the State was intentionally withholding information. The record discloses, however, that Milburn's attorney became aware that the State had withheld some evidence and therefore filed a motion to postpone the trial and compel disclosure. As a result, the prosecutor acknowledged that material evidence had not been disclosed, the trial was rescheduled, and the prosecutor produced evidence relating to the entomologist's examination of fly larvae from the victim's body. Milburn argues that the district court could not confirm that the information

regarding the larvae was the evidence to which the detective was referring in his conversation with DeGeus. However, it is Milburn who bears the burden of proof in this action, *Clark v. State*, 92 Idaho 827, 452 P.2d 54 (1969); *Nielson v. State*, 121 Idaho 779, 780, 828 P.2d 342, 343 (Ct.App.1992), and he has not shown that other evidence was concealed by the prosecution. Milburn did not present evidence sufficient even to raise a genuine factual issue with regard to his assertion that exculpatory evidence was withheld. The district court was therefore correct in dismissing this claim.

### III

### CONCLUSION

We affirm the district court's order dismissing Milburn's claims alleging ineffective assistance by his first attorney and concealment of exculpatory evidence by the prosecution. We reverse the order insofar as it dismisses the claims that Milburn received ineffective assistance of counsel from attorneys Wiebe and Fouser, and we remand the case for further proceedings on those claims.

PERRY, J., and WALTERS, Acting J., concur.