**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36474**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2011 Unpublished Opinion No. 415 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: March 25, 2011 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| JOSE MANUEL SANCHEZ, | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Defendant-Appellant. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Bannock County. Hon. David C. Nye, District Judge.

Judgment of conviction for 112 counts of aggravated battery, <u>affirmed</u>.

Molly J. Huskey, State Appellate Public Defender; Elizabeth Ann Allred, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent.
_____

GRATTON, Chief Judge

Jose Manuel Sanchez appeals from his convictions on 112 counts of aggravated battery, Idaho Code §§ 18-903, 18-907(1)(a). We affirm.

**I.**

**FACTS AND PROCEDURAL BACKGROUND**

The State presented the following evidence at trial. Sanchez and Sharon Tusi met in 1992 in Pocatello while they were both students in the Applied Tech Upholstery Program at Idaho State University. Tusi ultimately worked for Sanchez doing upholstery work for several years. Sanchez, who was married at the time, and Tusi became friends and that friendship soon turned into a sexual relationship. Shortly thereafter, Sanchez began accusing Tusi of having sexual relationships with other men and threatened that something was going to happen to her if she did not confess to her actions.

In August of 1992, Tusi traveled back to the eastern United States to visit family and, while there, had conversations with Sanchez that made her believe he was there and watching her. When she returned to Pocatello, Sanchez accused her of having inappropriate relations with a previous boyfriend during her travels. Throughout the remainder of the year, Sanchez told Tusi that people (a clandestine government group that Sanchez worked with, his family in Mexico who were similar to the family from the "Godfather" movie, and his family in Pocatello) were watching her, that they did not like her promiscuous conduct, and that they wanted to scalp her. Tusi shaved her head to avoid being scalped. When she questioned Sanchez about the actual existence of these groups of people, he told her to keep her mouth shut, that she was going to get in trouble, and that she was not supposed to know about them.

A number of incidents occurred that convinced Tusi that these groups existed. In 1993, Tusi received a letter written in Spanish directing her to shave her head, eyebrows, eyelashes, and crotch, which she did. Tusi believed it was from one of the clandestine groups and Sanchez, who translated the letter for her, told her to follow its instructions in order to avoid worse consequences. Around the same time, Sanchez told Tusi that he had found steaks in her mailbox and attached to her back door and, a few days later, she found a steak draped over her steering wheel. Sanchez told her that the steaks were a message that she was "dead meat." Tusi did not report the incident to the police because she thought that the group behind it was "higher up than the police."

On another occasion, Sanchez called Tusi and told her to check her back door because his wife had been there. When she checked the door, she found a door hanger with a picture of the grim reaper and the words "Enter and die" hanging on her back door. Sanchez told Tusi it was from his wife and that she should be careful. During the same time period, Sanchez told Tusi that a number of items in her house had been sprayed with hydrochloric acid. Tusi's backpack was deteriorated completely and the other items had holes in them. Tusi also discovered, around the same time, a large piece of wet, bloody animal skin underneath her mattress. Sanchez told her that one of the groups placed it there and that it meant that she was "dead meat." He told her to continue shaving her head because the group wanted to scalp her, and that they were talking about cutting out her tongue and making her eat it.

About a year after their relationship became sexual, Sanchez began beating Tusi because he was angry that she would not confess to having sex with other people, including her father,

2

her brothers, her children, and other men. Every time that Tusi denied these allegations, Sanchez would beat her. She began confessing to having these sexual relationships with other people to get him to stop beating her. This process continued from 1993 through 2006.

In the spring of 2007, Sanchez accused Tusi of trying to have sex with a male customer of their upholstery business. Sanchez told her that the incident was on video, and when she denied it, he beat her with his hands and fists, kicked her, and beat her with a bicycle tire tread. Thereafter, Sanchez beat her five or six days a week with the tire tread, which was his favorite item to beat her with throughout 2007, always accusing her of infidelities. In May 2007, Sanchez told her that she deserved to have her tongue cut out and her teeth pulled because she was lying about the incident with the customer. Sanchez told her that the "people" would pull out her teeth if she did not do it herself. At the end of the month, while beating Tusi with the tire tread, Sanchez forced her to start pulling out her teeth with a pair of pliers. Sanchez told her that she could choose to not take her teeth out, but that if she did not, the "people" would cut out her tongue and make her eat it. Over the next couple months, Sanchez forced Tusi to pull out five teeth, all of which she gave to him.

In late August of 2007, Sanchez tried to sew Tusi's vagina shut with a curved upholstery needle. Sanchez had told her that he was not going to have sex with her anymore until he could make a lady out of her, which meant when she stopped having sex with other people. Tusi thought that if she allowed Sanchez to sew her vagina shut, then he would realize that she was not having sex with anyone else and he would stop beating her. After about an hour-and-a-half of trying and Tusi screaming and crying, Sanchez stopped and beat her instead.

Thereafter, Sanchez told Tusi that she needed to help him find a way to stop her from having sex with other people, and that if they could not find a way, then the "people" would do it for her and it would be a lot worse. Sanchez threatened that the "people" would cut off her toes or shoot her in the buttocks with an exploding bullet and that they had done that to a woman who had been unfaithful to Sanchez's brother. Sanchez told Tusi that he was "mediating" between her and the "people" but that she needed to come up with a solution in order to satisfy them. One of the solutions that they discussed was to carve the words, "This belongs to Manuel Sanchez," or "Property of Jose Manuel," into Tusi's buttocks. Tusi suggested this as an alternative to being shot, hoping that the "people" would be satisfied. Tusi believed that she did

3

not have a choice, so she tried to come up with something "less harmful" than being shot but that would still satisfy the "people."

After determining that it was not possible for Tusi to carve her own buttocks, she suggested burning the words into her buttocks with a wood-burning tool. Sanchez approved of using the wood-burning tool and concluded that burning Tusi on the buttocks, abdomen, and vagina, in the shape of a bikini, was a good way to keep her from having sex with other people. Tusi believed that burning was "less harmful" than being shot. From the beginning of September through December 2007, Tusi would take off all of her clothing and sit on the dresser, and Sanchez would choose the locations of where she would be burned and burn her on her genital area and buttocks.

On December 22, 2007, Tusi decided that she was "at the end of the line." Sanchez told her that he intended to burn her from head to toe, and Tusi concluded that she would be disfigured permanently. Sanchez had also threatened to cut off her toes, her ears, her nose, her tongue, and scalp her. Tusi decided to tell her daughter about the abuse because she "couldn't take any more of the burning." That morning, she showed her daughter the burns, but told her not to contact the police unless she called and said the word "now." That night, Sanchez burned her again, and when it appeared he did not want to stop, a struggle ensued. While Sanchez was beating her, Tusi was able to call her daughter. The police arrived within a minute or two and arrested Sanchez.

Sanchez was charged with 112 counts of aggravated battery against Tusi based upon her allegations that he burned her between September 1, 2007, and December 22, 2007, and the jury ultimately convicted Sanchez on all 112 counts. Sanchez appeals.

## II.

## ANALYSIS

Sanchez raises several issues on appeal. First, he asserts that the district court erred in allowing the State to present evidence of alleged prior bad acts. Second, he argues that the district court erred in allowing the testimony and reports of various State experts. Third, he contends that the district court abused its discretion when it failed to order a competency evaluation. Fourth, he claims that the district court erred in failing to sever the counts into multiple trials. And fifth, he argues that all of the errors of the district court amount to cumulative error. We will address each of Sanchez's arguments in turn.

4

**A.      Prior Bad Acts**

Prior to trial, the State filed several motions in limine both to exclude and allow a variety of evidence.   Included in those motions was a request to admit evidence related to the relationship of Sanchez and Tusi, as well as evidence regarding the removal of several of Tusi's teeth.   The district court granted the State's motion regarding the relationship, but did not preclude Sanchez from objecting at trial.   With respect to the evidence regarding the removal of Tusi's teeth, the court concluded that the evidence "goes to the alleged victim's fear of Defendant and her submission to the charged conduct despite Defendant's poor health and lack of strength."   The court further determined:

> [E]vidence pertaining to the victim's teeth is in fact evidence that is inseparably connected to the chain of events of which the acts charged in the information are a part, that the charged and uncharged actions form an inseparable transaction, and that the evidence is required in order for the jury to gain an understanding as to the complete story of the crime charged.

Following the court's decision, conflict counsel was appointed to represent Sanchez.   Thereafter, conflict counsel filed several motions, including a motion in limine to exclude evidence of "other crimes, wrongs or prior offenses as it is not relevant; or if it is relevant, that it is misleading and of unfair prejudice to the Defendant; and, would cause confusion of the issues and be misleading."   The court denied Sanchez's motion in limine to exclude evidence of other wrongs concluding that it had already ruled on the issue.

At trial, Tusi began testifying about her relationship with Sanchez, to which Sanchez eventually objected on grounds that it was not relevant and prejudicial.   The court acknowledged that much of what Tusi was testifying to "could be characterized as uncharged crimes."   The court referenced its previous decision denying Sanchez's motion in limine and stated that it would not change its ruling.   After further testimony from Tusi, Sanchez objected again on similar grounds, and the court again concluded that it would not change its prior ruling, but granted Sanchez a standing objection.

Sanchez argues that the district court erred in allowing the State to present testimony that he committed prior bad acts involving the physical and mental abuse of Tusi from 1992 to 2007. He contends that the evidence was not relevant and that it was overly prejudicial.   The State asserts that the challenged evidence was relevant and that Sanchez has failed to demonstrate that

5

the district court abused its discretion by weighing the probative value of the evidence against its potential prejudice in admitting the evidence.

Evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's criminal propensity. I.R.E. 404(b); *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010); *State v. Parmer*, 147 Idaho 210, 214, 207 P.3d 186, 190 (Ct. App. 2009). However, such evidence may be admissible for a purpose other than that prohibited by I.R.E. 404(b). *Parmer*, 147 Idaho at 214, 207 P.3d at 190. In determining the admissibility of evidence of prior bad acts, the Supreme Court has utilized a two-tiered analysis. The first tier involves a two-part inquiry: (1) whether there is sufficient evidence to establish the prior bad acts as fact; and (2) whether the prior bad acts are relevant to a material disputed issue concerning the crime charged, other than propensity. *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009). Such evidence is relevant only if the jury can reasonably conclude the act occurred and the defendant was the actor. *Id.* We will treat the trial court's factual determination that a prior bad act has been established by sufficient evidence as we do all factual findings by a trial court. *Parmer*, 147 Idaho at 214, 207 P.3d at 190. We defer to a trial court's factual findings if supported by substantial and competent evidence in the record. *Id.* In this case, Sanchez does not challenge the existence of the prior bad act as an established fact. Therefore, we address only the second part of the first tier--the relevancy determination. Whether evidence is relevant is an issue of law. *Johnson*, 148 Idaho at 667, 227 P.3d at 921; *Parmer*, 147 Idaho at 214, 207 P.3d at 190. Therefore, when considering admission of evidence of prior bad acts, we exercise free review of the trial court's relevancy determination. *Parmer*, 147 Idaho at 214, 207 P.3d at 190.

The second tier in the analysis is the determination of whether the probative value of the evidence is substantially outweighed by unfair prejudice. *Grist*, 147 Idaho at 52, 205 P.3d at 1188. When reviewing this tier we use an abuse of discretion standard. *Id.* When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989).

6

### 1. Relevance

Sanchez contends that evidence of his alleged behavior toward Tusi prior to the charged crimes did not make it more or less probable that he committed the charged crimes. He maintains that the evidence "provides no insight as to the actions on the dates the alleged batteries occurred" and, as such, was not relevant. The State argues that the evidence was "necessary to explain why Tusi would essentially submit to torture on a nightly basis without taking steps, such as notifying the police, to stop it." We agree.

With respect to the charged conduct, Tusi testified that she submitted to being burned on her abdomen, buttocks, and genital area for nearly four months, from September 1, 2007, through December 22, 2007. She testified that Sanchez's reason for wanting her burned was to ensure that she did not have sex with other men. She testified, however, that she had never had sex with anyone other than Sanchez from the time that they began their sexual relationship. Nevertheless, Tusi herself suggested using the wood-burning tool. Her explanation for making that suggestion was that Sanchez had requested her assistance in coming up with a solution to stop her from having sex with other men, and that if they could not find a way, then the "people" would do it for her and it would be much worse. Her fear of the "people" was so great that she burned herself on December 21, 2007, at Sanchez's request, because he was not able to be there and do it himself.

All of the prior bad acts evidence was directly related to Tusi's fear of Sanchez and the "people." While Tusi did testify regarding a number of incidents that occurred well before the charged conduct, that evidence was relevant to establish the context of Tusi's relationship with Sanchez, as well as to explain Tusi's state of mind and why she would submit to being burned for nearly four months without going to anyone for help. *See Johnson*, 148 Idaho at 670-71, 227 P.3d at 924-25 (concluding that evidence of the defendant's statement to his wife that their daughter was confused about being molested because she had seen him watching pornography and masturbating was relevant to help the jury understand why his wife did not immediately act on her daughter's report that the defendant had abused her); *State v. Tapia*, 127 Idaho 249, 256, 899 P.2d 959, 966 (1995) (holding that the testimony of the other acts evidence was relevant to show why the victim did not report the defendant's conduct for several months). Tusi testified that several events occurred to convince her of the existence of the "people" and their ability to injure her and her family, i.e. receiving the letter directing her to shave her head, eyebrows,

7

eyelashes, and crotch; finding steaks implying that she was "dead meat;" finding a threatening sign on her back door that was allegedly from Sanchez's wife; discovering a number of items in her home that had allegedly been sprayed with hydrochloric acid; and finding a wet, bloody animal skin underneath her mattress implying that she was "dead meat." Tusi also testified regarding threats made to her by the "people," relayed by Sanchez, which included being scalped, having her tongue cut out and forcing her to eat it, being shot in her buttocks with exploding bullets, and having her buttocks cut up and fed to her family.

With respect to all of the incidents that occurred in 2007 prior to the burning, i.e. forcing Tusi to pull out several of her teeth, attempting to sew her vagina shut, and discussing carving the words "This belongs to Manuel Sanchez," or "Property of Jose Manuel," into Tusi's buttocks, each was directly related to Sanchez's accusations that Tusi was having sex with other men, that she was lying when she denied it, and that because the "people" did not approve of her alleged promiscuity, something needed to be done to make a lady out of her. In addition to being relevant to explain why she did not report the abuse, this evidence was also relevant to demonstrate a common scheme or plan. While Sanchez continually accused Tusi of having sex with other men, the impetus for much of the abuse in 2007 was Sanchez's specific allegation that Tusi had tried to have sex with a customer of their upholstery business. When she denied it, Sanchez forced her to pull out her own teeth because he said she was lying. Finally, Sanchez decided that he would stop having sex with her until he was satisfied that she was not having sex with other men, which included trying to sew her vagina shut, possibly carving words of ownership into her buttocks, and ultimately burning her for nearly four months on her abdomen, buttocks, and genital area. All of this conduct demonstrated Sanchez's common scheme or plan to exert and maintain control and power over Tusi, by instilling fear of reprisal such that she would submit to, and even herself suggest possible methods of abuse that would satisfy Sanchez and the "people" that she was not having sex with other men.

Sanchez argued in closing argument that Tusi's fear of the "people" was "hard to believe" and that she might just be telling a story. Sanchez asserted that Tusi burned herself because she was angry and resentful over not being paid for her work in the upholstery business, over giving him money to pay his mortgage, and over cutting off the sexual relationship. Sanchez suggested that Tusi's failure to tell others about the abuse indicated that it likely did not occur as she claimed. Sanchez also argued that he did not have the physical ability to burn Tusi

against her will with his bad back, and that Tusi even acknowledged that she had the capability to overpower him.

As the State asserts, the evidence of prior bad acts was relevant to address Sanchez's defense theories. Sanchez had repeatedly told Tusi that if she did not submit to the abuse, that the "people" would do far worse things to her and her family. Sanchez did not need to be physically capable of overpowering Tusi because he had spent years instilling in her a fear of reprisal. The district court recognized as much, concluding that the removal of Tusi's teeth "goes to the alleged victim's fear of Defendant and her submission to the charged conduct despite Defendant's poor health and lack of strength." The court also determined that the evidence was relevant to the material and disputed issue of consensual conduct. The court extended its ruling to the other bad acts evidence presented at trial, and we conclude that all of the prior bad acts evidence was highly relevant to show Sanchez's control over Tusi, Tusi's belief that she had no other choice but to endure the abuse or suffer the consequences, and to explain why she suggested the burning and never reported it.[1]

## 2. Prejudice

Sanchez argues that even assuming that the evidence is relevant, its prejudicial effect outweighs any limited probative value. He argues that the jury was "bombarded" with evidence that he had verbally, psychologically, and physically abused Tusi for approximately fifteen years, and that no juror could listen to the "detailed, ghastly, and revolting" evidence of prior bad acts without having a "sense of moral responsibility to convict Mr. Sanchez regardless of the jury instructions or the evidence presented regarding guilt as to the actual charges." The State argues that the evidence was highly probative in explaining Tusi's conduct and that Sanchez has failed to demonstrate that the district court abused its discretion.

In this case, the district court concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The court held that the evidence was "required in order for the jury to gain an understanding as to the complete story of the crime charged." A lower court's determination under I.R.E. 403 will not be disturbed on appeal unless

---

[1] Sanchez also argues that the evidence was improperly admitted as it does not fall under any of the exceptions listed in I.R.E. 404(b). However, as the language of Rule 404(b) itself makes clear, the list of exceptions is not exhaustive. *See State v. Hairston*, 133 Idaho 496, 501, 988 P.2d 1170, 1175 (1999) ("Rule 404(b) lists several permissible purposes such as proof of motive, intent, plan, knowledge, and identity, but this is not an exclusive list").

it is shown to be an abuse of discretion. *State v. Enno*, 119 Idaho 392, 406, 807 P.2d 610, 624 (1991); *State v. Clark*, 115 Idaho 1056, 1059, 772 P.2d 263, 266 (Ct. App. 1989). When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *Hedger*, 115 Idaho at 600, 768 P.2d at 1333.

As noted above, the evidence of prior bad acts in this case was highly probative as it served to explain Tusi's conduct. Shortly after Tusi began a relationship with Sanchez, he was instilling fear in her through abuse, as well as by convincing her that others could and would hurt her. Tusi's fear of the "people" was reinforced, not only by Sanchez's constant reminders to her, but also by a number of instances that convinced her that her actions were being monitored, such as receiving the letter and discovering the steak. This evidence was necessary to explain why Tusi felt that she could not escape the relationship. Tusi submitted to nearly four months of being burned. The evidence demonstrated that Tusi had been burned over 100 times, that the burns were administered over a period of time as they were in various stages of healing, and that her skin had been permanently damaged. It would be difficult for the jury to understand why Tusi would allow such abuse to continue, let alone suggest the method of abuse herself. The State was forced to demonstrate the nature of Tusi's relationship with Sanchez, and why she would submit to torture rather than tell someone, in order for the jury to see the full picture, putting her testimony about the charged conduct into context. *See State v. Scovell*, 136 Idaho 587, 590, 38 P.3d 625, 628 (Ct. App. 2001). As noted by the district court, the evidence was "required in order for the jury to gain an understanding as to the complete story of the crime charged." While the evidence was prejudicial, both in kind and quantity, it was not, on balance, unfairly prejudicial given the circumstances and defenses. We conclude that the district court appropriately balanced the probative value of the prior bad act evidence against the risk of unfair prejudice, and that Sanchez has failed to show that the court abused its discretion.[2]

---

[2]     Because we conclude that the district court properly admitted the evidence, Sanchez's arguments regarding *res gestae*, and error in the denial of his motion for a mistrial, both based on the admissibility of the evidence, are without merit.

**B.    Expert Testimony and Reports**

**1.    Psychiatric experts**

During trial, the State was allowed to present testimony of two psychiatric doctors who performed evaluations and provided treatment to Tusi following Sanchez's arrest. In addition to their testimony, the district court also admitted psychological reports that were created as part of their treatment. Dr. Predrag Gligorovic testified that he interviewed Tusi on December 23, 2007, following her admission into the Psychiatric Unit at Portneuf Medical Center for suicidal ideation. Gligorovic testified that his first diagnosis was to rule out shared psychotic disorder. He diagnosed Tusi with "physical abuse of adult," "acute stress disorder," and "dependent personality disorder." Gligorovic also performed a physical examination of Tusi and testified about her burns and treatment. He testified that he monitored Tusi for ten days, and then requested further testing following her discharge through Dr. John Christensen. Dr. Christensen, also a psychiatrist, testified at trial as well. He testified that he interviewed Tusi on January 30, 2008, and diagnosed her with post-traumatic stress disorder with co-occurring depressed mood. Both doctors made reports of their interviews and treatment of Tusi, and those reports were admitted into evidence. Sanchez argues on appeal that evidence of the doctors' testimony and reports is not relevant, that it is highly prejudicial, and that its admittance was error. The State contends that these arguments are not preserved for appeal.

Prior to trial, Sanchez did file a motion in limine to exclude State experts on several grounds. Sanchez acknowledges that trial counsel seemed to limit the focus of the motion to domestic violence experts, but maintains that the motion was also intended to include the psychiatric experts. This contention is belied by the record. The district court specifically inquired at the hearing as to whether the motion applied to all of the State's experts or just "particular ones." Sanchez responded that the motion applied to "particular ones," specifically those who would testify about domestic violence. As such, the motion in limine did not preserve for appeal any challenge to the psychiatric experts.

With respect to Dr. Christensen's testimony, Sanchez did object on the basis that his testimony was cumulative and that any probative value of the evidence was outweighed by its prejudicial effect. Sanchez also objected to the admission of Dr. Christensen's report on foundational grounds, as well as the fact that it was prejudicial. On appeal, Sanchez's only contention is that Dr. Christensen's testimony and report were not relevant. While Sanchez

11

objected on several grounds below, relevance was not one of them. An objection on one ground will not preserve a separate and different basis for excluding the evidence. *State v. Norton*, 134 Idaho 875, 880, 11 P.3d 494, 499 (Ct. App. 2000). Sanchez does include statements on appeal that the testimony and ensuing report were "highly prejudicial." However, he does not present any argument regarding whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. A party waives an issue on appeal if either authority or argument is lacking. *State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996). The issue on appeal is limited to the question of whether the evidence is relevant, and that issue has not been preserved. Therefore, we do not address it.

With respect to Dr. Gligorovic's testimony and reports, Sanchez objected to admission of the reports on the basis that the statements given by Tusi in the report were prejudicial, that they were not relevant, and that they were misleading and could cause confusion of the issues. Sanchez also argued that the State had not laid a proper foundation to have the report admitted. On appeal, as with Dr. Christensen's testimony and report, Sanchez's only contention is that the evidence is not relevant. As Sanchez did object below to the relevance of Tusi's statements in Gligorovic's report, we will address that issue.

Sanchez asserts that Gligorovic's testimony and reports addressed Tusi's mental health following the alleged battery and do not provide any evidence as to whether the batteries actually occurred. He argues that this evidence regarding post-battery events can in no way tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[3] I.R.E. 401. However, Tusi's mental health was a fact of consequence at trial. Sanchez suggested during closing argument that Tusi's story was so unbelievable that it created reasonable doubt and that, in fact, she may have burned herself. Tusi's testimony and Sanchez's defense certainly raise questions as to Tusi's state of mind. Gligorovic's testimony and reports were relevant to explain Tusi's fear of Sanchez and the "people." Gligorovic's testimony and reports indicate that when Tusi was first admitted, she was extremely fearful to name Sanchez as the individual who had abused her due to his alleged connection with a government group. She was placed on medication, and by the

---

[3]     Sanchez does not argue that the information contained in Gligorovic's testimony or reports regarding Tusi's burn treatment is not relevant.

12

time she was discharged, she no longer had the "belief that her boyfriend will come back and hurt her or that he has some special power and protection from the FBI as she had at the beginning." Moreover, Gligorovic's diagnoses were consistent with, and corroborative of, the evidence admitted to explain why Tusi remained in the relationship. Sanchez has failed to demonstrate that the evidence lacked relevance or was improperly admitted.[4]

### 2. Domestic violence expert

The State was also allowed to present testimony of Robb Redford, a domestic violence expert. Sanchez argues that the evidence was not relevant, that it was offered as character evidence to show he had the same or similar characteristics as male abusers generally, and that it contributed to a conviction based upon evidence other than substantive evidence of guilt. The State contends that this argument was not preserved by a timely objection.

Prior to Redford testifying, Sanchez objected to his testimony on grounds that he had no personal knowledge of the events in the case, that his testimony was not relevant, that it constituted a due process violation, that it was prejudicial, and that the State was trying to prove that Tusi was abused through his testimony. While Sanchez objected below on grounds of relevance, he did not present any of the other arguments he now raises on appeal. "[A]ppellate court review is limited to the evidence, theories and arguments that were presented below." *Johnson*, 148 Idaho at 670, 227 P.3d at 924. As such, we only review Sanchez's claim that the evidence was not relevant.

Redford testified that he is a mental health counselor, that he owns a family services business, and that he is the facilitator of the Domestic Violence Program. He stated that he works with male and female offenders of domestic violence, as well as their families. He also testified that he is licensed to provide mental health counseling, that he is certified to provide domestic violence treatment, and that he teaches a domestic violence course to offenders. Redford noted that there are three primary categories of abuse: verbal, emotional, and physical. He testified regarding various domestic violence issues, such as male privilege (king of the castle type behavior) and economic privilege (exercising control of finances). His testimony went to general characteristics of domestic violence and the reaction of victims to such violence, and he did not testify or offer an opinion about the specific facts in the instant case.

---

[4] We would reach the same conclusion as to the Dr. Christensen evidence had the issue been properly preserved.

Sanchez argues that the evidence was not relevant because it did not assist the jury in understanding whether he had battered Tusi. He contends: "The evidence offered, general behavior characteristics of male abusers, could have only been offered to show that Mr. Sanchez' actions, as testified to by Ms. Tusi, were in conformance with the actions and characteristics of male abusers, as it has no other relevant purpose." We find it difficult to understand how testimony that explains the actions of both offenders and victims of domestic violence is irrelevant simply because the theories explained match the testimony of the victim. The testimony was certainly relevant to explain the general behavior of offenders and victims of domestic violence. Many jurors may not have common experience with domestic violence and may not understand why a victim would stay in an abusive situation. Redford explained that victims of domestic violence often stay out of fear. He testified that victims commonly develop a belief system that they must stay in the abusive situation or "all these things will happen to them or they won't be able to take care of themselves." With respect to offenders, Redford stated that offenders use fear as a method to exert power and control over their victims. Redford's testimony was clearly relevant to explain the dynamics of domestic violence and how an individual may use power and control to instill fear in a victim and convince the victim to submit to severe abuse, while never telling anyone. As such, the district court did not err in allowing Redford to testify.

### 3. Language expert

As noted above, Tusi testified at trial that she received a letter, which was written in Spanish, directing her to shave her head, eyebrows, eyelashes, and crotch, which she did. The State offered the letter as an exhibit, and it was admitted. As the letter was written in Spanish, the State also sought to provide the jury with the translation of the letter into English. Therefore, the State called James Fogelquist, Chair of the Language Department at Idaho State University. Sanchez objected to Fogelquist's testimony, arguing that it was not relevant. He argued that Tusi's testimony regarding Sanchez's translation of the letter only went to her state of mind and what she thought the letter meant, not the actual translation of the letter. As such, he maintained that the translation was not relevant.

Sanchez objected below to the admission of the letter itself on grounds that it was not relevant. He does not, however, challenge the district court's admission of the letter on appeal. However, on appeal, Sanchez maintains that the translation of the content of the letter is not

relevant because the only potential relevance is what Tusi believed to be the contents, not the actual translation. The letter was relevant, however, as it directly corroborated Tusi's testimony. It corroborated the fact that Tusi did in fact receive a letter in 1993, and that it was written in Spanish. The fact that Tusi did not have personal knowledge as to what the letter said does not make it irrelevant. The translation of the letter corroborated Tusi's testimony as the letter did indeed convey threats, as well as instruct her to shave her body hair. With the letter itself and the translation, the jury was better able to assess the credibility of both Tusi and Sanchez. Tusi argues that Fogelquist's translation of the letter varied from Tusi's testimony of what she believed the letter said. However, any difference between Tusi's testimony and Fogelquist's translation goes to the weight of the testimony, not its admissibility. Therefore, the district court did not err in allowing Fogelquist to translate the letter.

C.      **Competency Evaluation**

Sanchez next asserts that the district court abused its discretion by denying a competency evaluation prior to the close of evidence at trial. He argues that defense counsel's request for an evaluation, presented due to concerns about a change in Sanchez's behavior, was sufficient to require the district court to order an evaluation. He claims that because the district court failed to evaluate his ability to understand the proceedings against him and assist in his own defense, it abused its discretion and, therefore, erred in denying the competency evaluation.

On the last day of trial, Sanchez requested a continuance to obtain a competency evaluation. Sanchez's counsel represented that in meeting with Sanchez, he was concerned about his mental state based upon some of the things Sanchez was saying. Counsel stated that while Sanchez had been interviewed prior to trial regarding his mental health, he had spoken with the doctor who did the initial interview and she had agreed to revisit Sanchez and interview him a second time that night. The district court denied Sanchez's motion for a continuance, indicating a belief that it was another delay tactic, but advised counsel that if the doctor did interview Sanchez and provide a report, the court would "certainly take that into account" but that it would not "hold up the trial for [the doctor's] schedule."

The decision to grant a motion for a continuance rests within the sound discretion of the trial court. *State v. Ransom*, 124 Idaho 703, 706, 864 P.2d 149, 152 (1993). When a trial court's discretionary decision in a criminal case is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as

one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *Hedger*, 115 Idaho at 600, 768 P.2d at 1333. Generally, it has been held that unless an appellant shows that his or her substantial rights have been prejudiced by reason of a denial of his or her motion for continuance, appellate courts can only conclude that there was no abuse of discretion. *State v. Cagle*, 126 Idaho 794, 797, 891 P.2d 1054, 1057 (Ct. App. 1995).

Here, the court concluded that Sanchez's attempt to continue the trial in order to obtain a competency evaluation was a delay tactic. The court noted the history of the case and other delays engaged in by Sanchez. Indeed, Sanchez received court-appointed counsel at the outset of the case. However, by the time of trial, Sanchez was on his third court-appointed counsel. Just prior to the trial date, Sanchez again requested new counsel. The court informed Sanchez that each time new counsel was appointed, additional time was required for new counsel to acquaint themselves with the case and get prepared, and that there was no way for new counsel to be prepared for trial the following week. The court stated that it believed Sanchez's request for another attorney was a delay tactic and denied that request. The court told Sanchez that his options were to represent himself or to proceed with his court-appointed counsel, Mr. Dykman. After engaging Sanchez in a lengthy colloquy, the court concluded that Mr. Dykman would remain counsel of record and that if Sanchez chose to represent himself at trial, Mr. Dykman would be stand-by counsel. At the outset of trial, Sanchez decided to allow Mr. Dykman to represent him. During trial, Sanchez again requested that the court appoint new counsel, and that request was denied. Based upon the history of the case and all of the delays, many of which were initiated by Sanchez, we conclude that the district court did not abuse its discretion in denying Sanchez's request for a continuance.

Sanchez's argument also suggests that the district court should have ordered an evaluation sua sponte based upon its observations of his conduct in court. The record makes clear, however, that the court did not preclude Sanchez from obtaining an evaluation. The court specifically informed Sanchez that if the doctor performed the interview and submitted a report, it would "take that into account." There is no indication in the record that any second interview took place, and no motion was filed to obtain a competency evaluation. The record also discloses numerous instances of Sanchez's understanding of the proceedings and no direct

16

evidence of an inability to consult with his lawyer. It cannot be said that the district court abused its discretion where no request for a competency evaluation was made, particularly where the court indicated that it would review any report that it received.

## D.    Motion to Sever

The State originally charged Sanchez with three counts of aggravated battery. The State, however, dismissed the original criminal complaint and a new complaint was filed charging 112 counts of aggravated battery. Sanchez filed a motion to sever the 112 counts, requesting separate trials on each count. He argued that because of the number of counts and the volume of evidence to be presented, he would not receive a fair trial unless the counts were severed. The State filed a response to Sanchez's motion to sever, arguing that joinder of the offenses was appropriate under Idaho Criminal Rule 8(a) because each of the counts was based upon acts or transactions connected together or constituting parts of a common scheme or plan. At a hearing held on the motion, Sanchez withdrew his motion.

Thereafter, the district court re-raised the issue of severance at a status conference held just prior to trial. The court heard oral argument on the issue, and the parties reasserted their earlier positions. Sanchez also argued that proceeding to trial on all 112 counts would be substantially prejudicial, and requested that the counts be severed such that the State would only be allowed to try three to five counts at the first trial with other counts tried at a later date, if at all. The State argued that it would call about fifteen witnesses whether there was one count or 112 counts. The State asserted that it would seek to put into evidence all 112 days of alleged burning even if only a small number of counts were tried because of the need to show an ongoing pattern. The State also argued that judicial economy would be better served by having one trial with one presentation of evidence and one set of jurors rather than multiple trials with multiple juries.

The district court determined that there was no question that there was a sufficient nexus between the 112 offenses to join them in one case under I.C.R. 8. The court noted that the real issue was whether it should exercise its discretion, pursuant to I.C.R. 14, to sever the counts and try them separately. The court noted that the extensive evidence the State intended to present would likely be admissible under I.R.E. 404(b) to show intent or plan regardless of severance. The court held that "[p]resenting the same evidence in multiple trials would be inconvenient, time consuming, and a waste of judicial resources." The court acknowledged Sanchez's

17

argument regarding a prejudicial "spillover" in that the jury would likely be influenced by the cumulative effect of evidence relating to distinct offenses when assessing whether the State had met its burden of proof on any one charge. The court noted that the same argument was presented in *United States v. Rivera*, 546 F.3d 245 (2d Cir. 2008), wherein the Second Circuit determined such a general claim of prejudice was insufficient and that the district court did not abuse its discretion as it appropriately instructed the jury to "consider each count separately and return a separate verdict of guilty or not guilty for each of them, and that its verdict must be unanimous as to each charge." *Rivera*, 546 F.3d at 254.

The district court also noted Sanchez's similar argument that the State's evidence on the three original counts may spill over and cause conviction on the other 109 "weaker" counts. The court noted, quoting *United States v. Olsen*, 519 F.3d 1096 (10th Cir. 2008), that "[s]imply because 'the government's evidence was stronger on some counts than on others does not mandate severance under Rule 14.'" Therefore, the court denied Sanchez's motion to sever.

An abuse of discretion standard is applied when reviewing the denial of a motion to sever pursuant to Idaho Criminal Rule 14; however, that rule presumes joinder was proper in the first place. *State v. Field*, 144 Idaho 559, 165 P.3d 273 (2007). Idaho Criminal Rule 14 provides, in relevant part:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in a complaint, indictment or information or by such joinder for trial together, the court may order the state to elect between counts, grant separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

Sanchez does not contend that joinder was improper. Rather, he argues that the district court abused its discretion in denying his motion to sever because trying the charges together created an overwhelming chance of prejudice.

When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *Hedger*, 115 Idaho at 600, 768 P.2d at 1333. When reviewing an order denying a motion to sever, the inquiry on appeal is whether the defendant has presented facts demonstrating that unfair prejudice resulted

from a joint trial, which denied the defendant a fair trial. *State v. Eguilior*, 137 Idaho 903, 908, 55 P.3d 896, 901 (Ct. App. 2002). In cases such as this, Idaho appellate courts review the trial proceeding to determine whether one or more of the following "potential sources of prejudice" appeared: (a) the possibility that the jury may confuse and cumulate the evidence, rather than keeping the evidence properly segregated; (b) the potential that the defendant may be confounded in presenting defenses; and (c) the possibility that the jury may conclude the defendant is guilty of one crime and then find him or her guilty of the other simply because of his or her criminal disposition, i.e. he or she is a bad person. *Id.*

Sanchez claims on appeal, without directly addressing the district court's findings or rationale, that the court erred in denying his motion to sever the 112 counts of aggravated battery into several separate trials. He argues that the court abused its discretion because there was potential for prejudice from the jury confusing and cumulating the evidence, as well as from the jury finding him guilty of all 112 counts due to his criminal disposition. We disagree.

With respect to Sanchez's first argument, there is no indication that the jury confused and/or cumulated the evidence. There was sufficient evidence presented upon which the jury could find, beyond a reasonable doubt, that Sanchez was guilty of each of the counts filed against him. Sanchez argues that because the State elected to charge him with 112 counts of aggravated battery when Tusi was only able to specifically recall being burned on three of the 112 days, the jury was bombarded with cumulative evidence that intertwined all of the allegations around the three dates that Tusi specifically remembered. This argument ignores the great weight of the evidence. Tusi testified that Sanchez burned her each night (except for one) from September 1, 2007, through December 22, 2007, on her abdomen, buttocks, and genital area. The State questioned Tusi on direct examination regarding each day. She acknowledged, as to all but three of the dates, that she did not have a specific recollection of being burned, but that she knew she was burned because "it happened every day." The physical evidence and the doctors' testimony corroborated Tusi's testimony that she had been burned every day for nearly four months as she had hundreds of burns in various stages of healing.

Sanchez argues that the district court failed to identify and weigh the prejudice that would result from the cumulative evidence. This argument is belied by the record. The court acknowledged Sanchez's argument regarding cumulative evidence and concluded that it could be dealt with through proper instruction to the jury. The court did instruct the jury that it had to find

19

Sanchez guilty of each individual count and provided a separate verdict form for each count to avoid the possibility of the jury confusing or cumulating the evidence. Sanchez does not even address the district court's determination.

Sanchez next argues that he was prejudiced because the jury convicted him based upon propensity evidence. He contends that the sheer number of charges may have convinced the jury to convict based upon criminal propensity. This argument fails, however, as all of the evidence would have been admissible to demonstrate a common scheme or plan had the counts been severed and, therefore, Sanchez has suffered no actual prejudice. *See State v. Longoria*, 133 Idaho 819, 824, 992 P.2d 1219, 1224 (Ct. App. 1999) (holding that the defendant suffered no actual prejudice as a result of the denial of his motion to sever because evidence regarding each separate count would be admissible to prove another count on the basis of a common scheme or plan).

As the State notes, it would have been impossible to "separate the evidence into evidence of one night's burns as opposed to another night's burns." The same evidence would have been presented whether there was one trial or 112 trials. The district court acknowledged as much noting that "[p]resenting the same evidence in multiple trials would be inconvenient, time consuming, and a waste of judicial resources." Sanchez has failed to demonstrate that the district court abused its discretion in denying his motion to sever.

E.     **Cumulative Error**

Sanchez also argues that the errors of the district court in admitting improper evidence amount to cumulative error. The cumulative error doctrine refers to an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, show the absence of a fair trial in contravention of the defendant's right to due process. *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998). The presence of errors alone, however, does not require the reversal of a conviction because, under due process, a defendant is entitled to a fair trial, not an error-free trial. *Id.* Because we have found no error, the cumulative error doctrine does not apply.

## III.

## CONCLUSION

The district court did not err in allowing evidence of Sanchez's prior bad acts or expert testimony. The district court did not abuse its discretion in denying Sanchez's motion for a

continuance in order to obtain a competency evaluation or in denying his motion to sever. The cumulative error doctrine does not apply to this case. Sanchez's judgment of conviction is, therefore, affirmed.

Judge LANSING and Judge GUTIERREZ **CONCUR.**